FEDERAL OPEN MARKET COMMITTEE OF THE
FEDERAL RESERVE SYSTEM *v.* MERRILL

No. 77–1387.   Argued December 6, 1978—Decided June 28, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which STEWART, J., joined in part, *post,* p. 364.

*Kenneth S. Geller* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock, Leonard Schaitman,* and *Thomas G. Wilson.*

*Victor H. Kramer* argued the cause for respondent. With him on the brief was *Douglas L. Parker.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The Federal Open Market Committee has a practice, authorized by regulation, 12 CFR § 271.5 (1978),[1] of withholding

---

*Diane B. Cohn* and *Girardeau A. Spann* filed a brief for the Reporters Committee for Freedom of the Press et al. as *amici curiae* urging affirmance.

[1] The regulation provides:

"§ 271.5 Deferment of availability of certain information.

"(a) *Deferred availability of information.* In some instances, certain types of information of the Committee are not published in the FEDERAL REGISTER or made available for public inspection or copying until after such period of time as the Committee may determine to be reasonably necessary to avoid the effects described in paragraph (b) of this section or as may otherwise be necessary to prevent impairment of the effective discharge of the Committee's statutory responsibilities.

"(b) *Reasons for deferment of availability.* Publication of, or access to, certain information of the Committee may be deferred because earlier disclosure of such information would:

"(1) Interfere with the orderly execution of policies adopted by the Committee in the performance of its statutory functions;

"(2) Permit speculators and others to gain unfair profits or to obtain advantages by speculative trading in securities, foreign exchange, or otherwise;

"(3) Result in unnecessary or unwarranted disturbances in the securities market;

"(4) Make open market operations more costly;

"(5) Interfere with the orderly execution of the objectives or policies

certain monetary policy directives from the public during the month they are in effect. At the end of the month, the directives are published in full in the Federal Register. The United States Court of Appeals for the District of Columbia Circuit held that this practice violates the Freedom of Information Act, 5 U. S. C. § 552. 184 U. S. App. D. C. 203, 565 F. 2d 778 (1977). We granted certiorari on the strength of the Committee's representations that this ruling could seriously interfere with the implementation of national monetary policy. 436 U. S. 917 (1978).

## I

Open market operations—the purchase and sale of Government securities in the domestic securities market—are the most important monetary policy instrument of the Federal Reserve System.[2] When the Federal Reserve System buys securities in the open market, the payment is ordinarily credited in the reserve account of the seller's bank, increasing the total volume of bank reserves. When the Federal Reserve System sells securities on the open market, the sales price usually is debited in the reserve account of the buyer's bank, decreasing the total volume of reserves. Changes in the volume of bank reserves affect the ability of banks to make loans

---

of other Government agencies concerned with domestic or foreign economic or fiscal matters; or

"(6) Interfere with, or impair the effectiveness of, financial transactions with foreign banks, bankers, or countries that may influence the flow of gold and of dollar balances to or from foreign countries."

[2] App. 46, 55. See generally Board of Governors of the Federal Reserve System, The Federal Reserve System, Purposes and Functions 14–15, 49–67 (1974).

Other major economic tools employed by the Federal Reserve System include the setting of reserve requirements for commercial banks that are members of the Federal Reserve System, and the determination of the discount rate for borrowing by member banks. App. 46, 56.

and investments.[3]   This in turn has a substantial impact on interest rates and investment activity in the economy as a whole.

The Federal Open Market Committee (FOMC or Committee), petitioner herein, by statute has exclusive control over the open market operations of the entire Federal Reserve System.   12 U. S. C. § 263 (b).   The FOMC[4] is charged with conducting open market operations "with a view to accommodating commerce and business and with regard to their bearing upon the general credit situation of the country." § 263 (c).   To implement this authority, the Committee has established a combined investment pool for all Federal Reserve banks, known as the System Open Market Account. A senior officer of the Federal Reserve Bank of New York is regularly appointed Account Manager of the System Open Market Account.

The FOMC meets approximately once a month to review the overall state of the economy and consider the appropriate course of monetary and open market policy.   The Committee's principal conclusions are embodied in a statement called the Domestic Policy Directive.   The Directive summarizes the economic and monetary background of the FOMC's deliberations and indicates in general terms whether the Committee wishes to follow an expansionary, deflationary, or unchanged monetary policy in the period ahead.   The Committee also attempts to agree on specific tolerance ranges

---

[3] Under the Federal Reserve Board's Regulation D, 12 CFR Pt. 204 (1978), member banks are required to hold reserves in a prescribed ratio to deposits.   Member banks typically respond to an increase in available reserves (or to a reduction in the required reserve-to-deposit ratio) by either making new loans and investments, or by selling their excess reserves to other member banks that can take advantage of these reserves because of particular lending or investment opportunities.   App. 47.

[4] The Committee is composed of the seven members of the Board of Governors of the Federal Reserve System, and five representatives of the Federal Reserve banks.   12 U. S. C. § 263 (a).

for the growth in the money supply and for the federal funds rate.[5] The recent practice of the Committee has been to include these tolerance ranges in the Domestic Policy Directive.[6]

[5] The tolerance ranges for the growth of the money supply are stated in terms of "$M_1$," defined as currency in circulation plus demand deposits held by the public in commercial banks, and "$M_2$," defined as "$M_1$" plus time and savings deposits, other than large negotiable certificates of deposit, held in commercial banks. App. 81. The federal funds rate is the rate at which commercial banks are willing to lend or borrow immediately available reserves on an overnight basis. *Id.*, at 78. As such, it is particularly sensitive to changes in the availability of reserves. The Committee's use of these concepts, expressed in terms of tolerance ranges, is illustrated by the operative language of the Domestic Policy Directive adopted at the October 17, 1978, meeting of the FOMC:

"Early in the period before the next regular meeting, System open market operations shall be directed at attaining a weekly-average Federal funds rate slightly above the current level. Subsequently, operations shall be directed at maintaining the weekly-average Federal funds rate within the range of 8¾ to 9¼ per cent. In deciding on the specific objective for the Federal funds rate the Manager shall be guided mainly by a range of tolerance for growth in $M$–2 over the October-November period of 5½ to 9½ per cent, provided that growth of $M$–1 over that period does not exceed an annual rate of 6½ per cent." 64 Fed. Res. Bull. 947, 956, (1978).

[6] Prior to February 1977, the Domestic Policy Directives did not include specific tolerance ranges for the growth in money supply and the federal funds rate. Instead, the operative language of the Directives contained such general phrases as "the Committee seeks to achieve some easing in bank reserve and money market conditions, provided that the monetary aggregates do not appear to be growing excessively"; "the Committee seeks to achieve bank reserve and money market conditions consistent with more rapid growth in monetary aggregates over the months ahead than has occurred in recent months"; or "the Committee seeks to achieve bank reserve and money market conditions consistent with moderate growth in monetary aggregates over the months ahead." App. 82–83. The record does not indicate in what manner the tolerance ranges were communicated to the Account Manager during this period.

After February 1977, the operative language of the Directives began to incorporate specific tolerance ranges of the form set forth in n. 5, *supra*. The record contains no explanation as to why the FOMC began including

The day-to-day operations of the Account Manager are guided by the Domestic Policy Directive and associated tolerance ranges, and by a daily conference call with the staff and at least one member of the FOMC. Subject to this oversight, the Manager has broad discretion in implementing the Committee's policy. In transacting business for the System Open Market Account, he deals with about 25 dealers who actively trade in United States Government and federal agency securities. Roughly half of these dealers are departments of large commercial banks; the others include large investment firms and smaller firms that specialize in Government securities. These dealers trade primarily for their own account. App. 33.

The Federal Reserve Board is required by statute to keep a record of all policy actions taken by the FOMC with respect to open market operations. 12 U. S. C. § 247a. To comply with this requirement, the FOMC secretariat prepares a document during the month after each Committee meeting. This document is called the Record of Policy Actions. It contains a general review of economic and monetary conditions at the time of the meeting, the text of the Domestic Policy Directive, any other policy actions taken by the Committee, the votes on these actions, and the dissenting views, if any. A draft of the Record of Policy Actions is distributed to the participants at the next meeting of the Committee for their comments, and is revised and released for publication in the Federal Register a few days later. 41 Fed. Reg. 22261 (1976).

In other words, the Record of Policy Actions is published in the Federal Register almost as soon as it is drafted and approved in final form by the Committee.[7] The Domestic

---

the tolerance ranges in the Directives at that time. Nor is there any explanation in the Record of Policy Actions issued after the February meeting. 63 Fed. Res. Bull. 380–394 (1977).

[7] Prior to 1967, the Records of Policy Actions were published only in the Federal Reserve Board's Annual Report to Congress. See Committee's Press Release, Mar. 24, 1975, App. 59; 413 F. Supp. 494, 504 (DC 1976). In response to the passage of the Freedom of Information Act in that

Policy Directive, however, exists as a document for approximately one month before it makes its first public appearance as part of the Record of Policy Actions. Moreover, by the time the Domestic Policy Directive is released as part of the Record of Policy Actions, it has been supplanted by a new Directive and is no longer the current and effective policy of the FOMC.

## II

Respondent, when this action was instituted in May 1975, was a law student at Georgetown University Law Center, Washington, D. C. App. 8. The complaint alleged that he had "developed a strong interest in administrative law and the operation of agencies of the federal government," and had formed a desire to study "the process by which the FOMC regulates the national money supply through the frequent adoption of domestic policy directives." *Ibid.*

In pursuit of these professed academic interests, respondent in March 1975, through counsel, filed a request under the Freedom of Information Act (FOIA) seeking the "[r]ecords of policy actions taken by the Federal Open Market Committee at its meetings in January 1975 and February 1975, including, but not limited to, instructions to the Manager of the Open Market Account and any other person relating to the purchase and sale of securities and foreign currencies." *Id.*, at 13.[8]

---

year, the FOMC instituted a policy of releasing the Record of Policy Actions, including the Domestic Policy Directive, 90 days after the Directive was adopted by the Commission. *Ibid.* On March 21, 1975, just before the instant lawsuit was filed, the period of delay was shortened to 45 days. 40 Fed. Reg. 13204 (1975). The present policy was adopted on May 24, 1976. 41 Fed. Reg. 22261 (1976).

Because the Record of Policy Actions is not completed and formally adopted until the meeting after the meeting to which it applies, respondent apparently conceded in the Court of Appeals that the Committee's present guidelines for release of that document are consistent with the FOIA. See 184 U. S. App. D. C. 203, 207, 565 F. 2d 778, 782 (1977).

[8] Respondent also requested the Memoranda of Discussion for the January 1975 and February 1975 meetings. App. 13. Memoranda of Discus-

The FOMC denied the request, explaining that the Records of Policy Actions, including the Domestic Policy Directive, were available only on a delayed basis under the policy set forth in 12 CFR § 271.5.[9] An administrative appeal resulted in release of the requested documents, but only because the withholding period by then had expired. Governor Robert C. Holland of the Federal Reserve Board, on behalf of the Committee, wrote to respondent's counsel that the Committee remained firmly committed to what he described as "a legislative policy against premature disclosures which would impair the effectiveness of the operations of Government agencies." App. 21.

Respondent then instituted this litigation in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief against the operation of 12 CFR § 271.5 and the policy of delayed disclosure. App. 7. The FOMC in due course moved for summary judgment, and submitted affidavits from Committee members and staff that generally advanced two reasons why immediate disclosure of the Domestic Policy Directives and tolerance ranges would interfere with the FOMC's statutory functions.

First, the Committee argued that immediate release of the

---

sion were detailed minutes of the statements made and actions taken at the Committee's meetings. The District Court held that under 5 U. S. C. § 552 (b) (5) respondent was entitled to those parts of the Memoranda that contained "reasonably segregable" statements of fact, 413 F. Supp., at 506, and the parties subsequently agreed on the factual portions of the Memoranda to be produced. This ruling was not challenged in the Court of Appeals, see 184 U. S. App. D. C., at 207 n. 8, 565 F. 2d, at 782 n. 8, and is not in issue here.

In May 1976, the FOMC voted to discontinue the preparation of Memoranda of Discussion, 62 Fed. Res. Bull. 581, 590–591 (1976).

[9] In accordance with the then-current policy of the FOMC, see n. 7, *supra,* the regulation specifically provided that "the Committee's current economic policy directive adopted at each meeting of the Committee is pubished in the FEDERAL REGISTER approximately 90 days after the date of its adoption." 12 CFR § 271.5 (1975).

Domestic Policy Directive and tolerance ranges would make it difficult to implement limited or gradual changes in monetary policy. Disclosure of the FOMC's monetary policy objectives would have an immediate "announcement effect," as market participants moved quickly to adjust their holdings of Government securities in anticipation of purchases or sales by the System Open Market Account. This would result in sudden price and interest rate movements, which might be considerably larger than the Committee contemplated and might be beyond the power of the FOMC or the Federal Reserve to control.

Second, the FOMC contended that immediate disclosure of the Directive and tolerance ranges would permit large institutional investors, who would have the means to analyze the information quickly and act rapidly in buying or selling securities, to obtain an unfair advantage over small investors.

Respondent submitted no counter-affidavits to these contentions, since he considered them "irrelevant" to the legal issues presented. Brief for Respondent 33–34, n. 12. The District Court apparently agreed. Without addressing the FOMC's affidavits, or entering any findings about the effect that premature disclosure might have on open market operations, the court granted summary judgment for respondent. 413 F. Supp. 494 (DC 1976). It held, as the FOMC had conceded, that the Domestic Policy Directives were "statements of general policy . . . formulated and adopted by the agency" that, under 5 U. S. C. § 552 (a)(1)(D), had to be "currently publish[ed] in the Federal Register for the guidance of the public." [10] It further concluded that by waiting until a new

[10] Section 552 provides:

"(a) Each agency shall make available to the public information as follows:

"(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

. . . . .

"(D) substantive rules of general applicability adopted as authorized by

Directive had been promulgated before publishing the preceding one, the FOMC was in violation of the "current publication" requirement. 413 F. Supp., at 505. Finally, the court rejected the Committee's contentions that the Domestic Policy Directives could be withheld under either Exemption 2 of the FOIA, relating to internal personnel rules and practices of an agency, or Exemption 5, relating to inter-agency or intra-agency memorandums or letters which would not be available to a party other than an agency in litigation with an agency.[11]

On appeal to the United States Court of Appeals for the District of Columbia Circuit, the FOMC did not contest the ruling that the Domestic Policy Directives were "statements of general policy" that, under § 552 (a)(1)(D), had to be "currently publish[ed]" in the Federal Register. Similarly, it did not challenge the conclusion that the 1-month delay failed to satisfy the current-publication requirement. Moreover, the Committee abandoned the argument that the Directives were covered by Exemption 2. The Committee, instead, concentrated on the contention that premature disclosure would seriously disrupt the conduct of open market operations, and continued to urge that the policy of delayed disclosure was authorized by Exemption 5.

---

law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."

The District Court also held that policy actions of the FOMC other than the Domestic Policy Directive had to be indexed and promptly disclosed pursuant to 5 U. S. C. § 552 (a)(B).

[11] Title 5 U. S. C. § 552 also provides:

"(b) This section does not apply to matters that are—

. .           .              .              .              .

"(2) related solely to the internal personnel rules and practices of an agency;

.              .              .              .              .

"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

The Court of Appeals rejected the FOMC's Exemption 5 arguments. It held that the Domestic Policy Directives were not exempt from disclosure under the "executive" privilege attaching to predecisional communications. It also ruled that Exemption 5 was not designed to protect against premature disclosure of otherwise final decisions. Finally, it concluded that there was no other civil discovery privilege that could serve as a basis for holding that the Directives were exempt from disclosure under Exemption 5. Like the District Court, the Court of Appeals expressed no opinion about the FOMC's assertion that immediate disclosure of the Domestic Policy Directives and tolerance ranges would seriously interfere with the conduct of national monetary policy. If the assertion were true, the court suggested, Congress could specifically exempt this material from the prompt-disclosure requirement of the FOIA.[12]    184 U. S. App. D. C. 203, 565 F. 2d 778 (1977).

## III

This Court has had frequent occasion to consider the FOIA,[13] and it is not necessary to describe its history and background in detail. It suffices to say that the purpose of the FOIA is "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delin-

---

[12] The third exemption specified by 5 U. S. C. § 552 (b) covers matters that are

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."

[13] See *EPA* v. *Mink,* 410 U. S. 73 (1973); *Renegotiation Board* v. *Bannercraft Clothing Co.,* 415 U. S. 1 (1974); *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132 (1975); *Renegotiation Board* v. *Grumman Aircraft Corp.,* 421 U. S. 168 (1975); *FAA Administrator* v. *Robertson,* 422 U. S. 255 (1975); *Department of Air Force* v. *Rose,* 425 U. S. 352 (1976); *NLRB* v. *Robbins Tire & Rubber Co.,* 437 U. S. 214 (1978); *Chrysler Corp.* v. *Brown,* 441 U. S. 281 (1979).

eated statutory language." S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965). The Act makes available to any person all agency records, which it divides into three categories: some must be currently published in the Federal Register, 5 U. S. C. § 552 (a)(1); others must be "promptly publish[ed]" or made publicly available and indexed, § 552 (a)(2); and all others must be promptly furnished on request, § 552 (a)(3). It then defines nine specific categories of records to which the Act "does not apply." § 552 (b). The district court is given jurisdiction to enjoin an agency from withholding agency records, and to order the production of any agency records improperly withheld. § 552 (a)(4)(B). The burden in any such proceeding is on the agency to establish that the requested information is exempt. *Ibid.*

At issue here is Exemption 5 of the FOIA, which provides that the affirmative disclosure provisions do not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." § 552 (b)(5). Exemption 5, in other words, applies to documents that (a) are "inter-agency or intra-agency memorandums or letters," and (b) consist of material that "would not be available by law to a party . . . in litigation with the agency."

## A

There can be little doubt that the FOMC's Domestic Policy Directives constitute "inter-agency or intra-agency memorandums or letters." FOMC is clearly an "agency" as that term is defined in the Administrative Procedure Act. 5 U. S. C. §§ 551 (1), 552 (e). And the Domestic Policy Directives are essentially the FOMC's written instructions to the Account Manager, a subordinate official of the agency. These instructions, although possibly of interest to members of the public, are binding only upon the Account Manager. The Directives do not establish rules that govern the adjudication of in-

dividual rights, nor do they require particular conduct or forbearance by any member of the public. They are thus "intra-agency memorandums" within the meaning of Exemption 5.

## B

Whether the Domestic Policy Directives "would not be available by law to a party . . . in litigation with the agency" presents a more difficult question. The House Report states that Exemption 5 was intended to allow an agency to withhold intra-agency memoranda which would not "routinely be disclosed to a private party through the discovery process in litigation with the agency . . . ." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966). *EPA* v. *Mink,* 410 U. S. 73, 86–87 (1973), recognized that one class of intra-agency memoranda shielded by Exemption 5 is agency reports and working papers subject to the "executive" privilege for predecisional deliberations. *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132 (1975), confirmed this interpretation, and further held that Exemption 5 encompasses materials that constitute a privileged attorney's work product. *Id.,* at 154–155.

The FOMC does not contend that the Domestic Policy Directives are protected by either the privilege for predecisional communications or the privilege for an attorney's work product.[14] Its principal argument, instead, is that Exemption 5 confers general authority upon an agency to delay disclosure of intra-agency memoranda that would undermine the effectiveness of the agency's policy if released immediately. This general authority exists, according to the FOMC, even if the memoranda in question could be routinely discovered by a party in civil litigation with the agency.

We must reject this analysis. First, since the FOMC does not indicate that the asserted authority to defer disclosure of

---

[14] Although the FOMC argued in the Court of Appeals that the Domestic Policy Directives were protected by executive privilege, it has not presented that argument here. Brief for Petitioner 30 n. 22.

intra-agency memoranda rests on a privilege enjoyed by the Government in the civil discovery context, its argument is fundamentally at odds with the plain language of the statute. *EPA* v. *Mink,* 410 U. S., at 85–86; *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S., at 149. In addition, the Committee's argument proves too much. Such an interpretation of Exemption 5 would appear to allow an agency to withhold any memoranda, even those that contain final opinions and statements of policy, whenever the agency concluded that disclosure would not promote the "efficiency" of its operations or otherwise would not be in the "public interest." This would leave little, if anything, to FOIA's requirement of prompt disclosure, and would run counter to Congress' repeated rejection of any interpretation of the FOIA which would allow an agency to withhold information on the basis of some vague "public interest" standard. H. R. Rep. No. 1497, *supra,* at 5, 9; S. Rep. No. 813, *supra,* at 3, 5, 8; *EPA* v. *Mink,* 410 U. S., at 78–80.

The FOMC argues, in the alternative, that there are several civil discovery privileges, in addition to the privileges for predecisional communications and an attorney's work product, that would allow a district court to delay discovery of documents such as the Domestic Policy Directives until they are no longer operative. The Committee contends that Exemption 5 incorporates each of these privileges, and that it thus shields the Directives from a requirement of immediate disclosure.

Preliminarily, we note that it is not clear that Exemption 5 was intended to incorporate every privilege known to civil discovery. See *NLRB* v. *Robbins Tire & Rubber Co.,* 437 U. S. 214, 254 n. 12 (1978) (POWELL, J., concurring in part and dissenting in part). There are, to be sure, statements in our cases construing Exemption 5 that imply as much. See, *e. g., Renegotiation Board* v. *Grumman Aircraft Corp.,* 421 U. S. 168, 184 (1975) ("Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and

case law in the pretrial discovery context"). Heretofore, however, this Court has recognized only two privileges in Exemption 5, and, as *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S., at 150–154, emphasized, both these privileges are expressly mentioned in the legislative history of that Exemption.[15] Moreover, material that may be subject to some other discovery privilege may also be exempt from disclosure under one of the other eight exemptions of FOIA, particularly Exemptions 1, 4, 6, and 7.[16] We hesitate to construe Exemption 5 to incorporate a civil discovery privilege that would substantially duplicate another exemption. Given that Congress specifically recognized that certain discovery privileges were incorporated into Exemption 5, and dealt with other civil discovery privileges in exemptions other than Exemption 5, a claim that a privilege other than executive privilege or the attorney privilege is covered by Exemption 5 must be viewed with caution.

The most plausible of the three privileges asserted by the FOMC[17] is based on Fed. Rule Civ. Proc. 26 (c)(7), which

---

[15] See H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966) (referring to "advice from staff assistants and the exchange of ideas among agency personnel"); S. Rep. No. 813, 89th Cong., 1st Sess., 2 (1965) (noting that Exemption 5 includes "the working papers of the agency attorney and documents which would come within the attorney-client privilege if applied to private parties").

[16] Exemption 1 applies to classified national security information; Exemption 4 applies to trade secrets and privileged commercial or financial information obtained from a person; Exemption 6 covers personnel and medical files the disclosure of which would constitute a clearly unwarranted invasion of privacy; and Exemption 7 shields certain types of investigatory records gathered for law enforcement purposes. 5 U. S. C. §§ 552 (b)(1), (4), (6), (7).

[17] The two other privileges advanced by the FOMC are a privilege for "official government information" whose disclosure would be harmful to the public interest, see *Machin* v. *Zuckert,* 114 U. S. App. D. C. 335, 338, 316 F. 2d 336, 339, cert. denied, 375 U. S. 896 (1963), and a privilege based on Fed. Rule Civ. Proc. 26 (c)(2), which permits a court to order that discovery "may be had only on specified terms and conditions, including a designation of the time or place." In light of our disposition of

provides that a district court, "for good cause shown," may order "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way."[18] The Committee argues that the Domestic Policy Directives constitute "confidential . . . commercial information," at least during the month in which they provide guidance to the Account Manager, and that they therefore would be privileged from civil discovery during this period.

The federal courts have long recognized a qualified evidentiary privilege for trade secrets and other confidential commercial information. See, e. g., E. I. du Pont de Nemours Powder Co. v. Masland, 244 U. S. 100, 103 (1917); 8 J. Wigmore, Evidence § 2212, pp. 156–157 (McNaughton rev. 1961). The Federal Rules of Civil Procedure provide similar qualified protection for trade secrets and confidential commercial information in the civil discovery context. Federal Rule Civ. Proc. 26 (c)(7), which replaced former Rule 30 (b) in 1970, was intended in this respect to "reflec[t] existing law." Advisory Committee's Notes on Fed. Rule Civ. Proc. 26, 28 U. S. C. App., p. 444. The Federal Rules, of course, are fully applicable to the United States as a party. See, e. g., United States v. Procter & Gamble Co., 356 U. S. 677, 681 (1958); 4 J. Moore, Federal Practice ¶ 26.61 [2], p. 26–263, (1976). And

---

this case, we do not consider whether either asserted privilege is incorporated in Exemption 5.

[18] The full text reads:

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed. Rule Civ. Proc. 26 (c)(7).

we see no reason why the Government could not, in an appropriate case, obtain a protective order under Rule 26 (c)(7).[19]

To be sure, the House and Senate Reports do not provide the same unequivocal support for an Exemption 5 privilege for "confidential . . . commercial information" as they do for the executive and attorney work product privileges. Nevertheless, we think that the House Report, when read in conjunction with the hearings conducted by the relevant House and Senate Committees, can fairly be read as authorizing at least a limited form of Exemption 5 protection for "confidential . . . commercial information."

In hearings that preceded the enactment of the FOIA, various agencies complained that the original Senate bill, which did not include the present Exemption 5,[20] failed to

---

[19] See *Menominee Engineering Corp.* v. *United States*, 20 Fed. Rules Serv. 2d 894 (Ct. Cl. 1975); *Consolidated Box Co., Inc.* v. *United States*, 18 Fed. Rules Serv. 2d 115 (Ct. Cl. 1973) (involving applications for protective orders under the identically worded Rule 71 (f) of the Court of Claims).

[20] S. 1666, introduced in the 88th Congress in 1963, included a fifth-numbered exemption for "intra-agency or inter-agency memorandums or letters dealing solely with matters of law or policy." It was reported favorably by the Senate Judiciary Committee, S. Rep. No. 1219, 88th Cong., 2d Sess. (1964), and passed the Senate, but reached the House too late for action. *Department of Air Force* v. *Rose*, 425 U. S., at 362–363; *Renegotiation Board* v. *Bannercraft Clothing Co.*, 415 U. S., at 18 n. 18. Substantially the same measure was reintroduced in the 89th Congress as S. 1160 and H. R. 5012. Freedom of Information Source Book, Subcommittee on Administrative Practice and Procedure, Senate Judiciary Committee, S. Doc. No. 93–82, p. 8 (1974). After additional hearings in the House in March and April 1965, Hearings on H. R. 5012, etc., before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess. (1965), and in the Senate in May 1965, Hearings on S. 1160, etc., before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess. (1965), the Senate Judiciary Committee struck the words "dealing solely with matters of law or policy," and inserted in lieu thereof "which would not be available by law to a private party in litigation with

provide sufficient protection for confidential commercial information and other information about Government business transactions. For example, the Department of Defense expressed concern that information relating to the purchase or sale of real estate, materials, or other property might not be protected, Hearings on S. 1160, etc., before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 418 (1965); the General Services Administration stressed the need to avoid early disclosure of information that might prejudice the Government's bargaining position in business transactions, id., at 480; and the Post Office Department urged that in matters such as the negotiation of contracts, it should stand on the same footing as a private party. Hearings on H. R. 5012, etc., before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 224 (1965). Included among those expressing such criticism was the Acting General Counsel of the Department of the Treasury, who specifically referred to the Department's concern about premature disclosure of information concerning Federal Reserve open market operations. *Id.*, at 49.[21]

---

the agency." S. Rep. No. 813, *supra* n. 15, at 1. The bill, as thus amended, passed the Senate on October 13, 1965. It was reported favorably by the House Committee on Government Operations, H. R. Rep. No. 1497, *supra* n. 15, passed the House on June 20, 1966, and was signed by President Johnson on July 4, 1966.

[21] Acting General Counsel Smith stated:

"I might interpolate at this point another example or two which I do not have in my statement. Information as to purchases by the Federal Reserve System, for example, of Government securities in the market, if prematurely disclosed could have, we feel, serious effects on the orderly handling of the Government's financing requirements so that in all of these things there is a question of timing. There are many things on which full disclosure is made in reports which are published or filed with the Congress with a timelag, there is no basic secrecy about these matters, and yet the premature release of these could be very damaging to the general interest."

After the hearings were completed, Congress amended the provision that ultimately became Exemption 5 to provide for nondisclosure of materials that "would not be available by law to a party . . . in litigation with the agency." The House Report, echoing the Report on the original Senate bill, S. Rep. No. 1219, 88th Cong., 2d Sess., 6–7, 13–14 (1964), explained that one purpose of the revised Exemption 5 was to protect internal agency deliberations and thereby ensure "full and frank exchange of opinions" within an agency. H. R. Rep. No. 1497, *supra* n. 15, at 10. It then added, significantly:

> "Moreover, a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated *before it completes the process of awarding a contract* or issuing an order, decision or regulation. This clause is intended to exempt from disclosure this and other information and records wherever necessary without, at the same time, permitting indiscriminate administrative secrecy" (emphasis added). *Ibid.*

In light of the complaints registered by the agencies about premature disclosure of information relating to Government contracts, we think it is reasonable to infer that the House Report, in referring to "information . . . generated '[in] the process of awarding a contract," specifically contemplated a limited privilege for confidential commercial information pertaining to such contracts.[22]

This conclusion is reinforced by consideration of the differences between commercial information generated in the process of awarding a contract, and the type of material protected by executive privilege. The purpose of the privilege for predecisional deliberations is to insure that a decision-

---

[22] Although the Senate Report does not contain a similar reference to information generated in the process of awarding a contract, there is no inconsistency in this respect between the House Report and the Senate Report. Cf. *Department of Air Force* v. *Rose,* 425 U. S., at 363–367.

maker will receive the unimpeded advice of his associates. The theory is that if advice is revealed, associates may be reluctant to be candid and frank. It follows that documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected, since disclosure at any time could inhibit the free flow of advice, including analysis, reports, and expression of opinion within the agency. The theory behind a privilege for confidential commercial information generated in the process of awarding a contract, however, is not that the flow of advice may be hampered, but that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered. Consequently, the rationale for protecting such information expires as soon as the contract is awarded or the offer withdrawn.

We are further convinced that recognition of an Exemption 5 privilege for confidential commercial information generated in the process of awarding a contract would not substantially duplicate any other FOIA exemption. The closest possibility is Exemption 4, which applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U. S. C. § 552 (b)(4). Exemption 4, however, is limited to information "obtained from a person," that is, to information obtained outside the Government. See 5 U. S. C. § 551 (2). The privilege for confidential information about Government contracts recognized by the House Report, in contrast, is necessarily confined to information generated by the Federal Government itself.

We accordingly conclude that Exemption 5 incorporates a qualified privilege for confidential commercial information, at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract.[23]

---

[23] Our conclusion that the Domestic Policy Directives are at least

## C

The only remaining questions are whether the Domestic Policy Directives constitute confidential commercial information of the sort given qualified protection by Exemption 5, and, if so, whether they would in fact be privileged in civil discovery. Although the analogy is not exact, we think that the Domestic Policy Directives and associated tolerance ranges are substantially similar to confidential commercial information generated in the process of awarding a contract. During the month that the Directives provide guidance to the Account Manager, they are surely confidential, and the information is commercial in nature because it relates to the buying and selling of securities on the open market. Moreover, the Directive and associated tolerance ranges are generated in the course of providing ongoing direction to the Account

---

potentially eligible for protection under Exemption 5 does not conflict with the District Court's finding that the Directives are "statements of general policy . . . formulated and adopted by the agency," which must be "currently publish[ed]" in the Federal Register pursuant to 5 U. S. C. § 552 (a)(1). 413 F. Supp., at 504–505. It is true that in *NLRB* v. *Sears, Roebuck & Co.*, we noted that there is an obvious relationship between Exemption 5 and the affirmative portion of the FOIA which requires the prompt disclosure and indexing of final opinions and statements of policy that have been adopted by the agency. 5 U. S. C. § 552 (a)(2). We held that, with respect to final opinions, Exemption 5 can never apply; with respect to other documents covered by 5 U. S. C. § 552 (a)(2), we said that we would be "reluctant" to hold that the Exemption 5 privilege would ever apply. 421 U. S., at 153–154. These observations, however, were made in the course of a discussion of the privilege for predecisional communications. It should be obvious that the kind of mutually exclusive relationship between final opinions and statements of policy, on one hand, and predecisional communications, on the other, does not necessarily exist between final statements of policy and other Exemption 5 privileges. In this respect, we note that *Sears* itself held that a memorandum subject to the affirmative disclosure requirement of § 552 (a)(2) was nevertheless shielded from disclosure under Exemption 5 because it contained a privileged attorney's work product. 421 U. S., at 160.

Manager in the execution of large-scale transactions in Government securities; they are, in this sense, the Government's buy-sell order to its broker.

Although the Domestic Policy Directives can fairly be described as containing confidential commercial information generated in the process of awarding a contract, it does not necessarily follow that they are protected against immediate disclosure in the civil discovery process. As with most evidentiary and discovery privileges recognized by law, "there is no absolute privilege for trade secrets and similar confidential information." 8 C. Wright & A. Miller, Federal Practice and Procedure § 2043, p. 300 (1970); 4 J. Moore, Federal Practice ¶ 26.60 [4], p. 26–242 (1970). Cf. *United States* v. *Nixon,* 418 U. S. 683, 705–707 (1974). "The courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure. Frequently, they have been afforded a limited protection." Advisory Committee's Notes on Fed. Rule Civ. Proc. 26, 28 U. S. C. App., p. 444; 4 J. Moore, Federal Practice ¶ 26.75, pp. 26–540 to 26–543 (1970).[24] We are mindful that "the discovery rules can only be applied under Exemption 5 by way of rough analogies," *EPA* v. *Mink,* 410 U. S., at 86, and, in particular, that the individual FOIA appli-

---

[24] Actually, orders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel, see, *e. g., Chesa International, Ltd.* v. *Fashion Associates, Inc.,* 425 F. Supp. 234 (SDNY 1977); *Xerox Corp.* v. *International Business Machines Corp.,* 64 F. R. D. 367 (SDNY 1974); *Scovill Mfg. Co.* v. *Sunbeam Corp.,* 61 F. R. D. 598 (Del. 1973); or to the parties, see, *e. g., Borden Co.* v. *Sylk,* 289 F. Supp. 847 (ED Pa. 1968); *United States* v. *Article of Drug Consisting of 30 Individually Cartoned Jars, More or Less,* 43 F. R. D. 181 (Del. 1967); *United States* v. *Standard Oil Co.* (*New Jersey*), 23 F. R. D. 1 (SDNY 1958). We think the Domestic Policy Directives should be considered "privileged," for Exemption 5 purposes, if any type of order would be appropriate forbidding disclosure of the confidential material therein to the general public.

cant's need for information is not to be taken into account in determining whether materials are exempt under Exemption 5. *Ibid.; NLRB* v. *Sears, Roebuck & Co.,* 421 U. S., at 149 n. 16. Nevertheless, the sensitivity of the commercial secrets involved, and the harm that would be inflicted upon the Government by premature disclosure, should continue to serve as relevant criteria in determining the applicability of this Exemption 5 privilege. Accordingly, we think that if the Domestic Policy Directives contain sensitive information not otherwise available, and if immediate release of these Directives would significantly harm the Government's monetary functions or commercial interests, then a slight delay in the publication of the Directives, such as that authorized by 12 CFR § 271.5, would be permitted under Exemption 5.

Here, the District Court made no findings about the impact of immediate disclosure of the Domestic Policy Directives and tolerance ranges. The Committee submitted unanswered affidavits purporting to show that prompt disclosure of this information would interfere with the orderly execution of the FOMC's monetary policies, and would give unfair advantage to large investors. In this Court, the FOMC has sought to supplement those affidavits by arguing, for the first time, that immediate release of the Domestic Policy Directives would jeopardize the Government's commercial interests by imposing substantial additional borrowing costs on the United States Treasury.[25] Respondent has sought, again for the first

---

[25] In its brief, the Committee argues that the "announcement effect" produced by immediate disclosure of the Directives and tolerance ranges would cause sharper fluctuations in the interest rates on Government securities traded by the System Open Market Account. As a result of these fluctuations, the risk of dealing in or purchasing Government securities would increase. To compensate for this larger risk, dealers and purchasers would demand a higher yield on Government securities. Given the huge amount of borrowing by the Federal Government each year, even a small change in yield on Government securities would represent a substantial cost to the Government. The FOMC estimates that the cost might run as high as $300 million annually. Brief for Petitioner 29.

time, to show that there is substantial disagreement among experts about the impact of prompt disclosure of the Directives, and that some experts actually believe prompt disclosure would have a beneficial effect. Brief for Respondent 33–46.

Under the circumstances, we do not consider whether, or to what extent, the Domestic Policy Directives would in fact be afforded protection in civil discovery. That determination must await the development of a proper record. If the District Court on remand concludes that the Directives would be afforded protection, then it should also consider whether the operative portions of the Domestic Policy Directives [26] can feasibly be segregated from the purely descriptive materials therein, and the latter made subject to disclosure or publication without delay. See *EPA* v. *Mink*, 410 U. S., at 91.

The judgment of the Court of Appeals is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART* joins, dissenting.

The practical question in this case is whether the Federal Reserve System's monthly changes in monetary policy should be made available immediately to the general public or should be filtered into the market through a handful of sophisticated representatives of large commercial banks and investment firms. The legal question is whether the statutory requirement that statements describing such policy changes be published "currently" means what it says.

On the practical level, it seems to me that the operation of an "open" market committee should be open to all—not just

---

[26] See nn. 5 and 6, *supra*.

*MR. JUSTICE STEWART joins this dissenting opinion insofar as it expresses views concerning the "legal question" presented.

to a selected few.[1]   On the legal level, I am satisfied that the District Court and the Court of Appeals correctly read the plain language of the Freedom of Information Act.

The FOIA, 5 U. S. C. § 552 (a)(1), provides that every "agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . statements of general policy . . . formulated and adopted by the agency." It is agreed that the Federal Open Market Committee is an agency within the meaning of the Act, and both the District Court and the Court of Appeals concluded that the monthly monetary policy directives are "statements of general policy." This Court does not disagree with that conclusion.   It is plain therefore that the statute imposes a mandatory requirement of "current" publication.

In my opinion that requirement is not satisfied by withholding publication "temporarily"—*i. e.*, until the policy directives become obsolete.   The same principle of construction should apply to monthly policy statements as to annual policy statements.   They should be made public while they are effective.

Although the Court recognizes that these policy directives may not be permanently withheld from public view without violating the Act, it nonetheless concludes that their tempo-

---

[1] As Professor Milton Friedman of the University of Chicago stated: "May I say also that I have long been in favor of the immediate release of the records of policy actions of the FOMC.   I have recommended repeatedly in testimony to Congress that the FOMC meetings be held on a Friday so that the record of policy actions can be written . . . and then released not later than Sunday night so that no business days pass without this record being available."   Hearings on H. R. 9465 and 9589 before the Subcommittee on Domestic Monetary Policy of the House Committee on Banking, Finance and Urban Affairs, 95th Cong., 1st Sess., 202 (1977).

These views also reflect those of Sherman Maisel, a former member of the Federal Reserve Board, who has written in this context that "[m]ost experts on markets . . . believe that the better the information, the better the market."   S. Maisel, Managing the Dollar 175 (1973).

rary suppression is warranted by one of the statutory exemptions to the Act. I find this conclusion incomprehensible.

In the first place, nothing in any of the nine exemptions to the Act has any bearing on the present situation.[2]   But more

---

[2] The Court relies on Exemption 5, but I find its analysis unpersuasive. The Court admirably recognizes the danger of allowing every conceivable discovery privilege to be read into Exemption 5. See *ante,* at 354–355. It proposes, therefore, that only those privileges that are recognized in the legislative history of FOIA should be incorporated in the Exemption. To the extent, however, that *every* reference in the subcommittee hearings to the danger of disclosing some type of governmental information suffices under this test—virtually every agency appeared before Congress with a list of such "dangers"—the Exemption would render the Act meaningless. On the other hand, if the Court's test is designed to limit Exemption 5 to those references in the legislative history that clearly bear on Congress' final understanding of the Act, I see no justification for the Court's recognition of a vague "commercial information" component of that Exemption.

First, the passage in the House Report that the Court relies on, which refers to "information which [an agency] has received or generated before it completes the process of awarding a contract," H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966), is rather clearly directed both at a different governmental activity (*i. e.,* procurement of goods or services by the Government acting as commercial buyer) and at a different stage in the course of that activity (*i. e., "before* it completes [its] process") than is involved in this case. Here, the agency is engaged in a clearly governmental activity—the regulation of financial markets—and has already settled upon its final position and has acted upon it. Moreover, the absence in the Senate Report of even this thin reed to support the Court's analysis is significant in light of our recognition that that Report, rather than the House Report, is the most accurate reflection of the congressional will with respect to FOIA. *Department of Air Force* v. *Rose,* 425 U. S. 352, 363–367. Finally, the fact that Congress did include a "commercial information" exemption in the Act, albeit one that clearly does not apply in this case—Exemption 4—should persuasively counsel against our adopting a novel and strained interpretation of another exemption to encompass such information. This is particularly so in this case in view of the fact that the very agency involved here unsuccessfully requested that Congress amend the proposed Exemption 4 to provide protection for the policy directives involved in this case. Hearings on H. R. 5012, etc., before a Subcommittee of the House Committee on Govern-

fundamentally, the Court's temporary exemption is inconsistent with the structure of the Act. Under FOIA, all information must be released, in the specified manner—*i. e.*, in this case, "currently"—unless it fits into one of nine categories. As to material in those categories, the Act simply *"does not apply."* 5 U. S. C. § 552 (b) (emphasis added). Between "current" release and total exemption, therefore, the statute establishes no middle ground. Accordingly, I cannot agree with the Court's recognition of a third alternative for "exempt" material to which the Act nonetheless applies—albeit on a delayed basis. If there is to be a new category subject to full disclosure but only after a "slight delay," I believe it should be created by Congress rather than the Court.

The Court's newly created category will impose substantial litigation costs and burdens on any requesting party seeking to overcome an agency's objection to immediate disclosure. For henceforth that party must prove that compliance with the statute's disclosure mandate would not "significantly harm the Government's monetary functions or commercial interests." *Ante,* at 363. The imposition of such an obstacle to prompt disclosure is inconsistent with the overriding statutory policy of giving the ordinary citizen unfettered access to information about how his Government operates.[3]

I respectfully dissent.

---

ment Operations, 89th Cong., 1st Sess., 51, 55, 228, 229 (1965). Having failed to provide such protection in Exemption 4, which so clearly relates to commercial information, Congress will no doubt be surprised to find that the Court has read that protection into Exemption 5.

[3] *E. g., Department of Air Force* v. *Rose, supra,* at 361; *EPA* v. *Mink,* 410 U. S. 73, 79–80.