**Samuel Lewis HACK, Plaintiff,**

v.

**DEPARTMENT OF ENERGY, et al., Defendants.**

Civ. A. No. 80–3043.

United States District Court, District of Columbia.

May 13, 1982.

Frederick C. Williams, Isham, Lincoln & Beale, Washington, D. C., for plaintiff.

Cheryl Long, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This is an action under the Freedom of Information Act, 5 U.S.C. § 552, whereby plaintiff seeks to compel defendants (the Department of Energy and several of its officials) to disclose portions of four documents, known as Conceptual Design Reports (CDRs), previously released to plaintiff in excised form. On August 25, 1980, plaintiff filed a request with the manager of the DOE's Oak Ridge Operations Office in Oak Ridge, Tennessee for the four reports, which concerned four contemplated projects at Oak Ridge. In a timely response, DOE released the four reports to plaintiff, with deletions. The agency stated that the deleted portions were exempt from disclosure because they were "recommendatory in nature and contain information which will be instrumental in the Govern-

ment's negotiations [and] which would expose and jeopardize the selection process [for architect-engineer contractors] if released prematurely." Letter dated September 11, 1980 from DOE to plaintiff, Pl. Exh.B. On September 16, 1980 plaintiff appealed the decision to segregate portions of the reports; that appeal was denied one month later, on the bases that disclosure would expose the deliberative process to public view and would harm the agency's efforts in procuring architect-engineers. Thus, plaintiff had exhausted his administrative remedies and the matter became ripe for resolution in the district court. Both sides have moved for summary judgment and have submitted appropriate memoranda and affidavits, and these motions are before the Court now.

Conceptual Design Reports, as their name suggests, are documents prepared in the early planning stages of construction projects. The need for a project is generally determined at the outset by the operator of a DOE installation;[1] this initial determination is reviewed by the agency at the field office and headquarters levels. Once DOE decides to proceed with the project, a conceptual design is prepared. A CDR is a summary of the conceptual design; it attempts to give some dimension to the ideas expressed in the concept so that the scope of the project may be fixed and its cost estimated.

In the administrative adjudication of plaintiff's request, DOE indicated that CDRs were also important to the process by which architectural/engineering (A/E) contractors are selected, and that disclosure would impair the government's ability to compete effectively for the services of such professionals. Plaintiff maintains that the government overstates the importance of CDRs to the A/E selection process and disputes the contention that their disclosure would harm the government's bargaining position with the contractors.

---

1. The operator may be a private concern, as is the case with regard to the four projects (all of which are government-owned) relevant to the four CDRs in question here.

The selection of A/E firms is governed by the Brooks Act, 40 U.S.C. §§ 541–44 (1976), which provides for an unusual, two-step procurement procedure. In the first step, the government agency determines which A/E firms are the most highly qualified to provide the services required. 40 U.S.C. § 543. Then, in the second step, the agency negotiates with the highest qualified firm for a contract to provide the services for a fair price. 40 U.S.C. § 544. DOE implements the Brooks Act by regulations found at 41 C.F.R. §§ 9–4.1000 through 9–4.1006 (1981), which embrace federal procurement regulations for architect-engineer services codified at 41 C.F.R. subparts 1–1.10 and 1–4.10 (1981).

The DOE's argument against disclosure essentially is that the documents may properly be withheld pursuant to Exemption 5 of FOIA, 5 U.S.C. § 552(b)(5), which provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt from disclosure. The agency asserts that the documents in question fall within Exemption 5 under either of two theories: (1) that CDRs contain "commercial information" to which a qualified privilege against disclosure attaches, following the rule in *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979), or (2) that the reports are withholdable as "deliberative process" material. As the Court finds the reports to constitute privileged commercial information, it is unnecessary to consider the "deliberative process" exemption theory.

The *Open Market* case involved a challenge to the agency's policy of not publishing certain monthly monetary policy directives in the Federal Register until the end of each monthly period—at which time the directives would have been replaced by new directives possibly rendering the policies in the previous directives without effect. The agency feared that immediate disclosure of the directives would make it difficult to implement gradual changes in monetary policy because market participants might adjust their holdings of Government securities in anticipation of purchases or sales by the agency and would give large investors, who could process the information in the directives and act thereupon more quickly, an unfair advantage over small investors. 443 U.S. at 348–49, 99 S.Ct. at 2806. Looking to Rule 26(c)(7) of the Federal Rules of Civil Procedure, which provides that a district court may prevent or restrict discovery of trade secrets or other confidential research, development, or commercial information, the Supreme Court concluded that Exemption 5 incorporates "a qualified privilege for confidential commercial information, at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract." *Id.* at 360, 99 S.Ct. at 2812. Upon remand, the District Court held that since immediate release of the directives would harm the government's monetary and commercial interests, the documents were exempt from disclosure under Exemption 5. *Merrill v. Federal Open Market Committee*, 516 F.Supp. 1028, 1030–31 (D.D.C.1981).

The government argues here, as it stated in its administrative denials of plaintiff's request, that disclosure of the withheld information would harm its commercial interests at both levels of its procurement procedure. First, it asserts that disclosure would interfere with the process by which qualified contractors are selected, to the extent that the process includes an inquiry into the candidate contractors' ability to create and present good technical proposals for the project. According to DOE, the solicitation for proposals by design contains only some of the information encompassed in the CDR, and that were the CDR made public, contractors lacking the ability and creativity to formulate an acceptable proposal on their own simply could mimic the CDR, thereby depriving the agency of the ability to determine the contractors' talents in this regard. Second, DOE argues that disclosure would interfere with its negotiation function as well in that disclosure of the cost estimates contained in a CDR would give the selected contractor an unfair bargaining advantage.

At the outset, the privilege requires that the documents be kept confidential. DOE has submitted affidavits of the Deputy Director of its Oak Ridge Operations Office and of each of the project engineers supervising the four projects for which the four CDRs in question were created. In each case the affiants state that the CDRs were prepared for internal use only and that, to the best of their knowledge, before A/E firms were selected for the projects no one outside the agency of the operating contractors who prepared the CDRs were allowed to view the reports. *See* Benedict affidavit at 2–3, Thomas affidavit at 2–3, Williams affidavit at 2, Walbauer affidavit at 2–3, Campbell affidavit at 2–3. Plaintiff, in his affidavit, states that during his employment with the DOE and its predecessor agencies (which employment terminated in 1979), it was never agency policy to treat CDRs as confidential nor did regulations require that the documents be kept confidential. Hack affidavit at ¶ 18. Moreover, he asserts, "50 to 200 copies of each CDR were routinely circulated throughout DOE in such a way that no control of end use or outside distribution was maintained over them." *Id.* However, he does not controvert the statements contained in the affidavits of the DOE officials that the CDRs at issue remained confidential. Plaintiff states that the practice of personnel having access to CDRs, once finished with them, was to dispose of them in ordinary trash. But this is not sufficient to strip the documents of their confidential nature. Plaintiff also states the CDRs often are given as a routine matter to the A/E firm ultimately selected. But, as defendant points out, and as its Oak Ridge office FOIA official, H. Stanton Oster, affirms in his affidavit, there is no need for continued confidentiality after the A/E firm is selected, except with respect to information relating to price negotiations—and until price negotiations are completed, portions of the CDR consisting of cost estimates are withheld. *See* Oster affidavit at 16. Plaintiff states that

he has received CDRs in the past by request from at least one DOE office and two operating contractors, Hack affidavit at ¶ 19, but as defendant's affiant George W. Benedict notes, plaintiff, "formerly the Director, Office of Construction and Facility Management at DOE Headquarters in Washington, D.C., may have unofficially gotten copies through his contacts in Headquarters." Benedict affidavit at 3.

The documents having been shown to have been kept confidential, DOE's further arguments that the CDRs are exempt from disclosure under *Open Market* shall be considered. As noted above, the DOE argues that exemption under *Open Market* is warranted and necessary to protect the A/E selection process and the contract negotiation process. The relevance of *Open Market* will be discussed with respect to each procedure in sequence.

Plaintiff challenges DOE's contention that disclosure of CDRs would jeopardize the selection and contract negotiation processes, charging that CDRs do not represent commercial information whose disclosure would harm its competitive position in that the reports, contrary to DOE's assertion, are not considered in the selection of A/E firms nor used in contract bargaining. A review of the statutes and regulations prescribing DOE's procurement procedures is essential to determine what role the CDRs play and whether that role requires that the reports not be disclosed. There is no dispute that the selection and negotiation processes are governed by the Brooks Act, 40 U.S.C. §§ 541–44, and the procurement regulations found at 41 C.F.R. subparts 1–1.10, 1–4.10, 9–4.10.[2]

The Brooks Act expresses the policy of the federal government to announce publicly all requirements for A/E services and to negotiate contracts for these services on the basis of "demonstrated competence and qualification for the type of professional services required and at fair and reasonable

---

**2.** Subpart 1–1.10 governs the publicizing of procurement actions. Subparts 1–4.10 and 9–4.10 regulate the process by which A/E services are procured, subpart 9–4.10 specifically concerning DOE procurement actions.

prices." 40 U.S.C. § 542; *see also* 41 C.F.R. §§ 1–4.1001, 9–4.1001. Procurement needs are publicized in accordance with 41 C.F.R. subpart 1–1.10, which, for A/E procurement actions with fees over $10,000, requires that a notice of intention to contract be published in the Commerce Business Daily, a government publication. 41 C.F.R. § 1–1.-1003–1(a), –3(c). The notice must contain a "brief statement" concerning the location of the project and the scope of service required, as well as (where applicable) the relative importance of the "significant evaluation factors," the construction cost limitation, and construction schedule limits. 41 C.F.R. § 1–1.003–7(b)(9). The Act, at § 543, directs that an agency head shall commence the procurement of A/E services by soliciting from firms annual statements of their qualifications and performance data. DOE offices that regularly procure A/E services are to collect and maintain current files on A/E firms: these files are to contain Standard Forms 254 (the annual statements of qualifications) and may also include information from other sources, such as appraisals of previous projects awarded to the particular firms. 41 C.F.R. §§ 9–4.1004–50, –53. For each proposed project, then, the agency head is to evaluate the statements in the firms' files, together with Standard Form 255, which indicate interest in a particular project. 40 U.S.C. § 543; 41 C.F.R. § 9–4.1004–53.

After the agency head considers the material in the appropriate files, he selects no less than three firms for discussions. 40 U.S.C. § 543; 41 C.F.R. § 9–4.1004–51(a). These discussions are to consider "anticipated concepts and the relative utility of alternative methods of approach for furnishing the required services ...." 40 U.S.C. § 543; 41 C.F.R. § 9–4.1004–52. "These discussions may be used to obtain additional qualification, performance, and management data, and other information needed to properly apply the evaluation criteria and evaluate the firms under consideration." 41 C.F.R. § 9–4.1004–52.

Next, pursuant to evaluation criteria established and published by him, the agency head selects, in order of preference, no less than three of the firms deemed to be the most highly qualified to provide the needed services. 40 U.S.C. § 543. The relevant evaluation criteria are found at 41 C.F.R. § 9–4.1004–3.

The relevant portion of § 543 of the Brooks Act and the DOE regulation [3] governing the discussions to be held with various firms provide that the discussions will include an exploration of various concepts and alternative approaches, and that the discussions may be used to obtain information needed to evaluate the firms. This information is relevant to, *inter alia,* the experience and competence of the firm, and the skills and abilities of its personnel, evaluation criteria set forth at 41 C.F.R. § 9–4.-1004–3(a)(2) and (b)(1). As such, a firm's creativity *is* a factor that the agency may consider at the discussion stage, and the disclosure of CDRs at or before that point most certainly would render inquiries as to this factor meaningless. Plaintiff suggests that disclosure of CDRs during the selection process could benefit the government because "[t]he more knowledge that architect-engineer firms have as to the detailed scope of the project, the more likely they are to assign the personnel in their organization best qualified to perform the work," and, as a consequence, the firms' Standard Form 255 submissions regarding particular projects would provide more meaningful information as to a firm's particular abilities relevant to a certain project. Pl.Mem. at 7. Whether plaintiff's suggested method would result in a selection process superior to the status quo is not for this Court to decide: DOE is entitled to exercise its discretion without undue judicial intervention in areas in which it has special expertise, and the agency's particular choice as to how, consistent with the statute, it will accumulate and evaluate the information presented to it, is one such matter best left to it. *See Merrill v. Federal Open Market*

---

**3.** 41 C.F.R. § 9–4.1004–52.

*Committee,* 516 F.Supp. at 1033.[4] As such, the CDRs may properly be withheld through the entirety of the selection process.[5]

The agency contends that the portion of the CDRs relating to cost estimates must be kept confidential even after the selection is made and the remainder of the reports need not be withheld as disclosure would impinge upon DOE's negotiation posture with the selected contractor. Plaintiff, in response, argues that there is no basis to keep this information confidential because "the pricing information is too coarse and stale to be of use in the procurement process." Pl. Mem. at 7. Moreover, plaintiff argues, since statutes and regulations prohibit the agency from negotiating with more than one firm at a time, the procurement procedure involves no price competition and, therefore, there is no reason for the agency to keep its cost estimates secret. Hack Affidavit at ¶ 25.[6] Again, it is essential to examine the statutory and regulatory authority guiding the negotiation process to determine whether the DOE's asserted need for confidentiality is valid.

The Brooks Act at 40 U.S.C. § 544(a) and DOE regulations at 41 C.F.R. § 9–4.1005 direct the agency to attempt to negotiate a contract with the firm found to be the "highest qualified" under the selection process, at a compensation determined to be "fair and reasonable to the Government." If the agency is unable to negotiate a satisfactory contract, negotiations with that firm are terminated and the agency then commences negotiations with the second most qualified firm. 40 U.S.C. § 544(b); 41 C.F.R. § 9–4.1005. The agency turns to negotiate with the next most qualified firms, in succession, should negotiations prove fruitless, and should the list of selected firms be exhausted, the agency must return to the selection process and choose additional firms with whom to negotiate, again one by one. 40 U.S.C. § 544(c); 41 C.F.R. § 9–4.1005. Before negotiations are begun, the appropriate procurement official must develop an independent government estimate of the cost of the required services, based on a "detailed analysis" of the costs that the work is likely to generate. 41 C.F.R. § 9–4.1005. In forming the estimate, these factors must be considered: the estimated value of the services to be rendered and the scope, complexity, and nature of the project. *Id.* The contracting officer uses the independent government estimate and the selected firm's proposal in negotiating the "fair and reasonable" price. 41 C.F.R. § 9–4.1005.

It is obvious that although firms do not engage in competitive bidding among themselves, the selected firm and the agency do indeed bargain over the contract price. Moreover, it is clear that the price information that the agency generates itself is a factor crucial toward the agency's establishment of its bargaining position. There can

---

**4.** Merrill had presented evidence from economic experts contradicting the agency's postulate that current disclosure of domestic policy directives would have a detrimental effect. Noting that "judgments pertaining to the validity of a particular policy are entrusted to the [Federal Open Market Committee] under the auspices of Congress," the court acknowledged it "lack[ed] the expertise necessary to substitute its judgment or that of plaintiff's experts for that of the FOMC." 516 F.Supp. at 1033.

**5.** Plaintiff also argues that as "[p]rice competition is not used in the selection of qualified architect engineers," there is no basis for withholding cost estimate information during the selection period. Pl.Mem. at 7. However, it is undeniable that different approaches and concepts are likely to have different costs, and as such, disclosure of this information at the discussion stage could interfere with this procedure as could the disclosure of any other important specification of the conceptual design. In any case, in light of this Court's conclusion that disclosure of cost estimates could disrupt the negotiation process (*see, infra*) following selection, and therefore may be withheld then, cost estimate information, *a fortiori,* may be withheld at this earlier stage.

**6.** Plaintiff also argues that the information need not be kept confidential because "[p]rice competition is not used in the selection of qualified architect engineers." Pl.Mem. at 7; Pl. Fact Statement ¶ 16, Hack Affidavit ¶ 20, however, DOE's arguments in favor of withholding the cost estimates primarily relate to the contract negotiation process rather than the earlier selection process.

be no doubt that were cost estimates made public the agency would not be on equal footing with the selected firm at the bargaining table. Requiring the agency to tip its hand by compelling the disclosure of its cost estimates could destroy all incentive a firm would have to propose a lower price. As such, the cost estimates contained in the CDRs are confidential commercial information to which the privilege in *Open Market* applies, and therefore which may be withheld until the contract for the project has been let. The agency seeks to withhold the information in the CDRs no longer than it properly may.[7] Consequently, plaintiff's motion for summary judgment shall be denied, and defendant's motion granted.

---

7. DOE has no objection to the disclosure of the CDRs, save for the cost estimate portions once the relevant projects are under contract. Once the actual construction contracts are let, the agency would be willing to disclose the cost portions as well. Def.Mem. at 4.