(629 P.2d 1174)

No. 52,852

No. 52,952

SOUTHWESTERN BELL TELEPHONE COMPANY, *Applicant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *et al., Respondents.*

Petition for review denied September 18, 1981.

 Opinion filed June 12, 1981.

*Lawrence A. Dimmitt* and *David P. Mudrick,* of Topeka, and *Jack Glaves* of Glaves, Weil & Evans, of Wichita, for the applicant.

*Donald A. Low,* assistant general counsel, and *Brian J. Moline,* general counsel, for the respondent State Corporation Commission.

*Milo M. Unruh,* of Wichita, for the intervenor-respondents, Boeing Military Airplane Company, *et al.*

Before ABBOTT, P.J., REES and SPENCER, JJ.

SPENCER, J.: On May 30, 1980, Southwestern Bell Telephone Company (SWB) filed its application with the Kansas Corporation Commission (Commission) for a general rate increase. In preparation of the case, SWB and the Commission's staff entered into an agreement for the production of documents on discovery. Pursuant to this agreement, certain documents SWB considered confidential and proprietary (trade secrets) were made available to the staff.

At a preliminary conference on November 3, 1980, staff gave notice, pursuant to the agreement, of intent to use certain of the documents during public hearings before the Commission. On November 10, 1980, SWB, also pursuant to the agreement, filed with the Commission a motion for a protective order seeking to maintain the documents' claimed confidentiality. Public hearings commenced November 17, 1980, at which time SWB renewed its motion for a protective order. The documents in question were deposition exhibits in a rate proceeding in the state of Texas. They involved what is referred to as the "installed base migration strategy," analyzing among other things a potential for "migrating" SWB customers to more current competitive telecommunications equipment. According to the evidence of SWB as presented through the testimony of its witness Thomas Carney, the documents convey several types of information:

> First, they reveal long-range proposed pricing strategies and underlying data for competitive products and services. Second, they outline existing inventories and specific products in certain competitive product lines and forecast product movement within those lines. Third, they include projected financial analyses of the impact proposed marketing strategies would

have on Southwestern Bell's revenues, cash flow and net income. Fourth, they disclose information about availability dates, prices and characteristics of future unannounced products to be offered. Fifth, they contain undisclosed financial plans and proposed budgets of Southwestern Bell. Sixth, they cover various AT&T and Southwestern Bell analyses of the impact of various specific competitors entering the market for certain products and services.

The documents have not been disclosed to the general public and, within the SWB system, they are provided only to those with a "need to know." Although they were made available to the Commission in this case, they were not used in filing the rate case.

On November 18, 1980, the KCC orally ruled:

"CHAIRMAN LOUX: The Commission has reviewed the transcript, reviewed the documents that were considered proprietary by the Applicant, and our decision is that at this point the Company is still a regulated company. It involves products that are still regulated by this Commission by statute. It involves pricing and that they are relevant and that they are not proprietary . . . .

. . . .

"MR. DIMMITT: Mr. Chairman, in regard to the Commission's ruling, I wonder if we might as an accommodation to the Applicant ask for a stay of that ruling for a reasonable period of time to permit us the opportunity to assess alternatives including possible judicial intervention, and I'm talking about maybe two or three hours, something like that if that's—

"CHAIRMAN LOUX: Yes."

That same day SWB filed an action for injunctive relief in the District Court of Shawnee County. That court issued a temporary restraining order at SWB's request. On December 11, 1980, the district court dismissed SWB's suit and vacated the temporary restraining order effective December 18, 1980, finding in the process that the Court of Appeals had exclusive jurisdiction.

On December 15, 1980, SWB applied to the Commission for a rehearing of the November 18th oral ruling. Prior to the date set for expiration of the district court's temporary restraining order, the Commission stayed its order as to disclosure until a decision on the rehearing. Rehearing was granted, and on December 23, 1980, the Commission issued a written order, stating in relevant part:

"[T]he Commission has reconsidered the documents' relevancy to this proceeding. Based on that review we find that certain documents have insufficient evidentiary value and relevancy with regard to the issues raised in these proceed-

ings to warrant their introduction into evidence. Although we believe that the 'migration strategy' in general is relevant to this case, specific figures and data which appear to relate solely to its implementation in other jurisdictions adds little to the evidence contained in other documents. . . . [Specific documents indicated as immaterial.]

. . .

"7. As to the claimed confidential nature of the remaining documents, the Commission concludes that they are not confidential, with one exception which will be discussed subsequently.

"The documents in question all relate to a marketing and pricing strategy developed or being developed by AT&T, which is referred to as the Installed Base Migration Strategy (IBMS). Some of the parties in this matter contend that this strategy has substantial implications for the regulatory and rate making process which should be addressed by this Commission. Staff argues that whatever the decision of the Commission with regard to the strategy, Kansas law requires public access to the evidence upon which the decision is based. SWB on the other hand argues that the evidence has been made available to the parties and Commission for consideration so that a decision can be made but that public disclosure of the information would potentially cause damage to SWB. This damage would potentially result because SWB's competitors could use the data and information in the documents to their own advantage.

"We agree with staff that K.S.A. 66-[106] reflects a legislative mandate to allow public access to not only the proceedings of this Commission but also the evidence introduced at those hearings. Further, the right to review the evidence does not terminate with the end of the hearings. We believe that the public is entitled to compare our decision setting the utility rates they will pay with the underlying evidence upon which the decision is based. Although SWB argues that the Kansas [open] meetings law, K.S.A. 1979 Supp. 75-4319(b)(4), and open records law, K.S.A. 1979 Supp. 45-201(a), would permit the restrictions proposed, we conclude that K.S.A. 66-106 is a more specific statute governing the activities of this Commission. It should also be noted that this Commission is required to make specific findings of fact and conclusions of law in its orders. If the documents in question were held to be confidential, it is clear that the Commission could not comply with its legal obligation to make specific findings of material facts regarding the concealed evidence.

"SWB in its arguments appears to use the terms 'trade secrets' and 'proprietary information' synonymously. Staff, on the other hand, apparently contends that they are not interchangeable terms and that the documents in question are not of a trade secret nature to which courts and legislatures have traditionally afforded protection. In reaching our conclusion the Commission does not believe it necessary to define 'proprietary information,' although that phrase would appear to encompass more than the term 'trade secrets.' What is necessary in the instant proceeding is an analysis of the nature of the documents and the claim for confidential treatment as contrasted with the public's interest in access to the evidence which justifies the utility rates ultimately borne by members of the public.

"Both staff and SWB have listed six factors which are used to evaluate the nature of information which is involved:

"(1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employee, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended on obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

Although SWB has presented some evidence and arguments concerning the value of the information to its competitors and the extent of its dissemination, it is unclear how much of the information is actually known by competitors or how much effort would be required to develop such information. Furthermore, we must admit some difficulty in discerning the value of much of this information to competitors in view of SWB's contention that the documents do not represent an actual plan which has been implemented but rather are forecasts or targets for consideration. This is especially true of the target pricing information since presumably the actual prices will be established by regulatory commissions. Since the regulatory process is, in fact, involved in these matters we conclude that the information in the documents in controversy is not entitled to protection . . . .

. . . .

8. "In conclusion, the Commission finds and concludes that evidence tending to show the existence of migration strategy is relevant to these proceedings. This decision is not meant to indicate any final decision on the issues which have been raised concerning IBMS but merely reflects our opinion that the existence of such a strategy could have a bearing on the issues of rate design, depreciation, license fee, and other areas which could ultimately affect the rates to be approved. Since the documents will need to be considered in arriving at the Commission's ultimate decision, we do not believe that they should be afforded confidential treatment . . . ."

The Commission directed that all of the contested exhibits be maintained under seal with the contents not disclosed, "until the Court of Appeals or other appropriate court has had an opportunity to rule on a request for a stay." On January 6, 1981, SWB filed its application for judicial review and motion for protective order with this court. The case was docketed under No. 52,852. On February 11, 1981, this court stayed the Commission's disclosure order and directed the contested documents remain under seal pending disposition of the matter on review or other order of this court.

Since the Commission's written order of December 23, 1980, which was mailed December 30, 1980, modified its previous oral ruling, SWB on January 9, 1981, filed with the Commission an application for rehearing pursuant to K.S.A. 66-118b, which was denied January 12, 1981. On February 11, 1981, SWB filed an

application for judicial review based on that denial. This case was docketed under No. 52,952, and was consolidated with No. 52,852. Both are now before this court for decision.

## I.

We first consider an argument, advanced by intervenors Boeing *et al.,* that SWB lost its right to judicial review by failing to file an application for rehearing with the Commission within ten days of the oral ruling entered on November 18, 1980.

Our Public Utility Act, K.S.A. 66-101 *et seq.,* is comprehensive in scope and makes full provision for procedure before the Commission. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 233, 440 P.2d 660 (1968). K.S.A. 66-113 provides in part:

"All orders and decisions of the corporation commission whereby any rates, joint rates, fares, tolls, charges, rules, regulations, classifications, schedules, practices or acts relating to any service performed or to be performed by such public utility or common carrier for the public are altered, changed, modified, fixed or established, shall be reduced to writing, and . . . served on the public utility . . . affected thereby . . . ."

K.S.A. 66-118a provides: "The court of appeals shall have exclusive jurisdiction of proceedings for review of an order or decision of the state corporation commission arising from a rate hearing . . . ." Proceedings for review of other orders or decisions are in a district court having venue.

K.S.A. 66-118b provides in part that "[a]ny party being dissatisfied with any order or decision of the state corporation commission" may apply for a rehearing within ten days "of the service of such order or decision," and that "[n]o cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall make application for a rehearing as herein provided." K.S.A. 66-118c provides that a party may apply for "a court review of such order or decision" within 30 days of the denial of the rehearing or after decision on the rehearing. K.S.A. 66-118d provides in part that upon application for judicial review, the KCC:

"[S]hall forthwith transmit to the clerk of the court in which the application for review has been filed, a certified transcript of all pleadings, applications, proceedings, orders or decisions of the commission and of the evidence heard by the commission on the hearings of the matter or cause . . . .

" . . . No court of this state shall have power to set aside, modify or vacate any order or decision of the commission, except as herein provided."

K.S.A. 66-118f provides in part that "[n]o new or additional evidence may be introduced upon the trial or any proceedings for review under the provisions of this act. The cause shall be heard upon the questions of fact and law presented by the evidence and exhibits introduced before the commission . . . ." The court may, however, stay the proceedings on review and direct the Commission to hear and consider additional evidence.

As prescribed by our statutes, "orders or decisions" subject to "review," are limited to written orders or decisions which are served on the parties, and which result from an evidentiary hearing before the Commission, of which a record is made. See *Fed. Power Comm'n. v. Edison Co.,* 304 U.S. 375, 82 L.Ed. 1408, 58 S.Ct. 963 (1938).

This conclusion is supported by the fact that Kansas reviewing courts have consistently required as "basic principles of administrative law" that "[o]fficial boards such as the commission . . . express their orders and decisions in *formal and explicit* findings to the end that *review* may be intelligent." *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. at 232; emphasis added.

It follows that the rehearing requirement of K.S.A. 66-118b is also limited to such written orders or decisions. SWB, therefore, did not lose its right to judicial review by failing to file application for rehearing within ten days of the oral order of November 18th. Having so determined, we need not decide whether the district court's restraining order, allegedly void for lack of jurisdiction, tolled the time for filing a rehearing application. The only order subject to "review" and the rehearing requirement was the written order of December 23rd. It is immaterial for present purposes that the Commission issued its order as one on rehearing of its previous oral order. The original case No. 52,852 filed with this court after the December 23rd written order, but prior to denial of the rehearing application as to that order, is therefore premature. Case No. 52,952, however, filed after denial of rehearing, and presenting the same issues, is before us and will be considered.

One further point deserves mention. If a party suffers injury as a result of Commission action, *e.g.,* an oral ruling, which does not constitute an "order or decision" subject to "review" as those terms are defined in this opinion, equitable relief by independent

action may be available in a district court. It is well established that:

"In the absence of a statutory provision for appellate review of an administrative decision no appeal is available but relief from illegal, arbitrary and unreasonable acts of public officials and boards can be obtained by using such equitable remedies as quo warranto, mandamus, or injunction." *Bush v. City of Wichita,* 223 Kan. 651, Syl. ¶ 2, 576 P.2d 1071 (1978).

This is so even though the action arises from a rate hearing in which "orders or decisions" are "reviewable" exclusively by the Court of Appeals. *Cf. Utah Fuel Co. v. Coal Comm'n,* 306 U.S. 56, 83 L.Ed. 483, 59 S.Ct. 409 (1939). In most instances, of course, actions and rulings of the Commission made prior to or during a rate proceeding can be fully and adequately considered upon "review" of the final "order or decision." Since an independent action can be maintained only when statutory "review" is inadequate [*Pelican Transfer & Storage v. Kansas Corporation Commission,* 195 Kan. 76, 402 P.2d 762 (1965)], such would be available only on those rare occasions when the challenged action was not an "order or decision" as herein defined, and when subsequent "review" would be an inadequate remedy. Thus, if we have jurisdiction to "review" the December 23rd order, an independent action was not available to SWB. On the other hand, even if we have such jurisdiction, the district court in this case may technically have erred by dismissing SWB's injunction action since at that time only the oral order of November 18th existed. As we have determined that such an oral order is not an "order or decision" subject to "review" or the rehearing requirement, an independent action was available assuming subsequent "review" to be an inadequate remedy. Be that as it may, if the written order of December 23rd is properly before us for review, any error on the part of the district court is moot in that the oral order was incorporated into the written order.

## II.

We have determined that "review" under our statutes is limited to written orders which have been served on the parties, and which result from an evidentiary hearing before the Commission. Although the written order of December 23rd meets these mechanical qualifications, we have, on our own motion, questioned whether it can be reviewed prior to and independent of a final order or decision by the Commission on SWB's rate request. In

response to an order of this court, the parties have briefed and argued this matter.

It may initially be noted that the law does not favor interlocutory judicial interference with the administrative process, be it through "appeal," "review," or independent equitable action. As stated in *Jarvis v. Kansas Commission on Civil Rights,* 215 Kan. 902, 904-05, 528 P.2d 1232 (1974):

> "The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. A primary purpose of the doctrine is the avoidance of premature interruption of the administrative process. It is normally desirable to let the administrative agency develop the necessary factual background upon which its decisions are based. Since agency decisions are frequently of a discretionary nature, or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. It is more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals. Frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

Thus, it has been held that mere preliminary or procedural rulings are not subject to review under a specific review statute (*Fed. Power Comm'n v. Edison Co.,* 304 U.S. at 383), or pursuant to an independent equitable action (*State Comm'n v. Wichita Gas Co.,* 290 U.S. 561, 78 L.Ed. 500, 54 S.Ct. 321 [1934]).

Nonetheless; orders or decisions made prior to the final order concluding administrative proceedings may constitute more than "mere preliminary or procedural" rulings. In *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964), the court construed the predecessor of K.S.A. 55-606, allowing judicial review of "any rule, regulation, order or decision of the commission" dealing with crude oil production. The order there challenged set the method of computing monthly allowable production in the Kansas-Hugoton Natural Gas Field. The appellants sought review not only of the general order but of monthly production orders which had been issued during the two years the general order was being studied. An issue arose as to whether these monthly orders could be reviewed absent a motion for rehearing after each was issued. In holding they could not, the court addressed the question of what constitutes an "order" subject to review.

"The orders were designated 'Interim Orders.' The district court ruled that this designation indicated that the orders were not final.

"We are concerned with the nature, character, and effect of the order and not with its name. (*Hayward v. State Corporation Comm.,* 151 Kan. 1008, 1013, 101 P.2d 1041.) G.S. 1949, 55-606, does not require that an order must be a 'final' in order to be subject to review. It authorizes the review of 'any' order by any person aggrieved by such order. It is not concerned with appeals, or appealable orders, nor with the definition of a final order in appellate procedure, or the jurisdiction of the courts with respect to such under the Code of Civil Procedure.

"Whether or not a particular determination made by an administrative body is an 'order' subject to review is determined by the substance of what that agency purports to do, or has done by the order, and not by the label placed upon it. Under the review procedure, an order is reviewable which determines rights or obligations or fixes some legal relationship as a consummation of the administrative process. (*C. & S. Air Lines v. Waterman Corp.,* 333 U.S. 103, 92 L.Ed. 568, 377, 68 S.Ct. 431.)

"The Supreme Court of the United States, in *Pennsylvania R. Co. v. United States,* 363 U.S. 202, 4 L.Ed.2d 1165, 80 S.Ct. 1131, stated the applicable principle as follows:

". . . We decided some years ago that while a mere 'abstract declaration' on some issue by the Commission may not be judicially reviewable, an order that determines a 'right or obligation' so that 'legal consequences' will flow from it is reviewable. . . .' (p. 205.)

. . .

"It is quite definite that the Commission intended the monthly allowable order to be final but not to determine or close the investigation under the show-cause docket. As timely petitions for rehearing were not filed covering the monthly allowable orders for May, 1956, through October, 1957, the orders were not subject to judicial review." 192 Kan. at 11-12.

Although the court stated that statutory review is not limited to "final orders" as defined in appellate procedure, it is of note that the monthly orders were found to be "final" in substance and intent.

Courts have generally required a degree of "finality" or "ripeness" before subjecting administrative action to judicial scrutiny. The United States Supreme Court decisions cited in *Colorado Interstate* were part of an evolving body of law on the "ripeness" of administrative action for judicial review. See 3 Davis, Administrative Law Treatise § 21.01 (1958) and § 21.00 (1980 Supp.). It is now clear that "finality" in the administrative context is to be interpreted "in a pragmatic way" and that "ripeness" "is best seen in a twofold aspect, requiring [evaluation of] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-149, 18 L.Ed.2d 681, 87 S.Ct. 1507

(1967). Relevant considerations include whether the challenged action is "definitive" and has a "direct and immediate effect" on the complaining party; whether the issues tendered are legal; and whether "administrative decision making has reached a stage where judicial review will not disrupt the orderly process of adjudication." *FTC v. Standard Oil Co. of Cal.,* 449 U.S. 232, 66 L.Ed.2d 416, 101 S.Ct. 488 (1980); *Marine Terminal v. Rederi. Transatlantic,* 400 U.S. 62, 71, 27 L.Ed.2d 203, 91 S.Ct. 203 (1970); *Abbott,* 387 U.S. at 151-153.

This pragmatic approach has been applied to determine whether action prior to culmination of the administrative proceedings is reviewable pursuant to specific review statutes in the federal courts of appeal. See, *e.g., Michigan Power Company v. Federal Power Commission,* 494 F.2d 1140 (D.C. Cir. 1974); *Phillips Petroleum Co. v. Federal Power Com'n,* 475 F.2d 842 (10th Cir. 1973), *cert. denied* 414 U.S. 1146 (1974). In *Phillips Petroleum,* the court cited language from *Columbia System v. U.S.,* 316 U.S. 407, 425, 86 L.Ed. 1563, 62 S.Ct. 1194 (1942), which is appropriate herein:

" 'The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.' " 475 F.2d at 848.

We conclude the Commission's December 23rd order denying SWB's request for a protective order is "reviewable" at this time. The matter is "fit for judicial decision." The order clearly determines a right or obligation so that "legal consequences" will flow from it. It is "definitive" with a "direct and immediate" effect on SWB. No disruption of the administrative process appears. The "hardship . . . of withholding court consideration" is evident. Disclosure of the confidential information, if wrongful, cannot be corrected on later review. The threatened injury is thus "irreparable" if not presently considered.

### III.

Having determined that we have jurisdiction of this action, we turn to consideration of the issues presented.

K.S.A. 66-118d limits judicial review of Commission orders or decisions to a determination of whether they are "lawful" and "reasonable." The standards governing this limited review were

set out in *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380-381, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

SWB contends disclosure is "unlawful" in that the Commission incorrectly relied on general rules favoring open meetings and ignored more specific and compelling legal standards protecting "trade secrets" and confidential commercial information. SWB also contends disclosure is "unreasonable" as not supported by the evidence. The Commission contends it properly "balanced" the procedural context, relevancy, and nature of the documents in deciding that they not be protected.

We are here concerned with whether the Commission should protect the documents which SWB contends are trade secrets. In this regard, K.A.R. 82-1-230(a) specifically makes "[t]he rules of evidence as stated in article 4 of the Kansas code of civil procedure" applicable to the Commission. K.S.A. 60-432 provides:

"The owner of a trade secret has a privilege, which may be claimed by the owner or his or her agent or employee, to refuse to disclose the secret and to prevent other persons from disclosing it if the judge finds that the allowance of the privilege will not tend to conceal fraud or otherwise work injustice."

Technically, SWB does not seek to invoke this evidentiary privilege. The information has been disclosed to the Commission. The issue is whether the Commission should protect the information from disclosure to the public.

In the civil discovery context, such matters are governed by K.S.A. 60-226(*c*)(7), which allows a court to order "a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Although this provision, unlike the evidentiary privilege of K.S.A. 60-432, is not directly applicable to the Commission, the federal rule on which it is based has been said to "reflect existing law." *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 356, 61 L.Ed.2d 587, 99 S.Ct. 2800 (1979). As such, the following analysis of Federal Rule of Civ. Proc. 26(c)(7) is helpful:

"It is well settled that there is no absolute privilege for trade secrets and similar confidential information; the protection afforded is that if the information sought is shown to be relevant and necessary, proper safeguards will attend disclosure. It is for the party resisting discovery to establish, in the first instance, that the information sought is within this provision of the rule and that he might be harmed by its disclosure. . . .

"If it is established that confidential information is being sought, the burden is

on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information. The matter was well put by the Advisory Committee on Rules of Evidence:

'The need for accommodation between protecting trade secrets, on the one hand, and eliciting facts required for full and fair presentation of a case, on the other hand, is apparent. Whether disclosure should be required depends upon a weighing of the competing interests involved against the background of the total situation, including consideration of such factors as the dangers of abuse, good faith, adequacy of protective measures, and the availability of other means of proof.' "

8 Wright & Miller, Federal Practice and Procedure: Civil § 2043, pp. 300-302 (1970).

Such an approach is consistent with *Pennzoil Co. v. Federal Power Commission,* 534 F.2d 627 (5th Cir. 1976), the leading case on administrative disclosure, independent of requests under the Freedom of Information Act, of information alleged to be of a trade secret nature. *Pennzoil* was a direct review of an order that gas reserve data submitted by producers to the FPC be made public. The court held the FPC had abused its discretion because the disclosure order was not "based on consideration of the relevant factors."

"In its brief order, the Commission stated that it was cognizant of the financial harm to the producers that compliance with its order would entail. The Commission, however, felt, that the 'public interest' outweighed such harm. We feel that this brief statement is inadequate as an articulation of a finding that disclosure of this information serves a legitimate regulatory function.

"In deciding whether this information should be disclosed, we believe the Commission must consider three additional factors. First, the Commission should consider whether disclosure of this type of detailed information will significantly aid the Commission in fulfilling its functions. . . . Secondly, the Commission should consider not only the harm done to the producers by releasing this information but the harm to the public generally. . . . Finally, and most importantly, the Commission should consider whether there are alternatives to full disclosure that will provide consumers with adequate knowledge to fully participate in the Commission's proceedings but at the same time protect the interests of the producers." 534 F.2d at 631-32.

We hold that, when deciding whether to publicly disclose information which the Commission has found to be relevant and necessary for its proceedings and which a party contends to be in the nature of a trade secret or confidential research, development or commercial information, the Commission should proceed as follows: First, it should determine whether the information is a trade secret or confidential commercial information. In consider-

ing this matter, the burden is on the party seeking to prevent disclosure. Secondly, the Commission should weigh the competing interests. In doing so, it should consider, *inter alia,* the financial or competitive harm to the party seeking to prevent disclosure; whether disclosure will aid the Commission in its duties; whether disclosure serves or might harm the public interest; and whether alternatives to full disclosure exist.

Our review of the written order of December 23rd reveals the Commission failed to consider some of the relevant factors and improperly applied others. It appears the Commission treated the nature of the evidence simply as one factor to be considered instead of as the threshold question. Whether information constitutes trade secrets is governed by *Koch Engineering Co. v. Faulconer,* 227 Kan. 813, 610 P.2d 1094 (1980), where the court stated:

"An exact definition of a trade secret may not be possible, but factors to be considered in recognizing a trade secret are: (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.,* by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information." Syl. ¶ 2.

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Syl. ¶ 3.

For purposes of disclosure, any distinction between trade secrets and confidential commercial information would appear immaterial. The Commission recognized the *Koch* factors but made no finding as to whether the evidence did in fact constitute trade secrets. The Commission stated only that it was "unclear how much of the information is actually known by competitors or how much effort would be required to develop such information." The record indicates that the information in question consists primarily of specific numerical data as to SWB's customers and equipment together with projections of costs, prices, and introduction dates of new equipment. In light of the evidence offered by SWB to the effect that as far as is known the data contained in the documents here in question has not previously been disclosed to the general public and has been made available to those within the SWB organization solely on a "need to know" basis, we find it

unrealistic to require more extensive evidence as to whether SWB customer lists and projected projects are known by competitors or as to how much effort would be required to develop that information.

On review, the Commission argues the information is not entitled to trade secret status because it relates to anticompetitive activity on the part of SWB. Even if such was to be considered, the Commission made no finding that the information was of that nature and we may not supply such a finding by implication. The Commission also argues the information lacks value to competitors because it consists of aggregates rather than specific numerical data. Again, the record fails to reflect this and the Commission made no finding in this regard. Given our lack of expertise, an independent examination would not be determinative. Finally, we perceive no "difficulty," as did the Commission, in finding "forecasts or targets" worthy of protection. In *Koch,* the court stated that a trade secret:

"[M]ay relate to a single item of information, a plan or compilation of information, or a combination of ideas and tangible expressions, such as drawings, patterns, devices, plans, notes and lists with which to put the item, plan or compilation to use. 2 Callmann, Unfair Competition Trademarks and Monopolies § 51.1 (3d ed. 1968 and 1979 Supp.)." 227 Kan. at 826.

Assuming the information in question is of a confidential commercial nature, disclosure turns on weighing the relevant factors discussed above. In this regard, the Commission made no finding as to financial or competitive harm to SWB or whether alternatives to full disclosure exist. On the questions of whether disclosure would aid the Commission in performance of its duties or serve the public interest, the Commission appears to have broadly concluded that public access to all evidence before it is required by law. We do not agree.

K.S.A. 66-106, which the Commission found controlling, provides in part: "No person desiring to be present at any investigation or hearing by said commission shall be denied admission." This provision is general in nature, applies to attendance at investigations or hearings, and is not relevant to disclosure of evidence except insofar as presented publicly during such investigation or hearing.

Consideration of requests for confidential treatment of information before the Commission is more directly governed by other

statutes. The Open Meetings Act, K.S.A. 75-4317 *et seq.,* and the Public Records Act, K.S.A. 45-201 *et seq.,* are both applicable to the Commission. K.S.A. 1980 Supp. 75-4318(*a*); K.S.A. 1980 Supp. 45-201(*a*). The Open Meetings Act specifically authorizes discussion of "confidential data relating to financial affairs or trade secrets of corporations" at closed or executive meetings. K.S.A. 75-4319(*b*)(4). The Public Records Act exempts from disclosure "records specifically closed by law or by directive authorized by law." K.S.A. 1980 Supp. 45-201(*a*). Neither of these statutes creates an affirmative right in SWB to prevent disclosure. Compare *Chrysler Corp. v. Brown,* 441 U.S. 281, 60 L.Ed.2d 208, 99 S.Ct. 1705 (1979) (holding that the Freedom of Information Act's exemption [5 U.S.C. § 552(b)(4)] of trade secrets does not create an independent right to prevent disclosure). Nonetheless, we conclude the Commission erred in finding the Open Meetings Act and Public Records Act inapplicable to the present controversy. The Commission, in its discretion, was authorized to hold a closed meeting to examine the evidence and had authority, consistent with the evidentiary privilege of K.S.A. 60-432, to issue a protective order shielding the evidence from public disclosure.

The Commission also referred to the requirement that it make specific findings of fact in its orders, stating that "[i]f the documents in question were held to be confidential, it is clear that the Commission could not comply with its legal obligation to make specific findings of material facts regarding the concealed evidence." Again, the Commission's analysis is too broad. Taken to its logical conclusion, it would abrogate any protection for trade secret information, a situation not required by law. There may be occasions when the Commission can fulfill its duty to make specific findings only by referring to specific trade secret information. On other occasions, it may be sufficient to summarize the data or refer to it generally. Each case will undoubtedly turn on its own facts. Nothing in the record made on the motion for a protective order demonstrates a need for total disclosure.

We note that since these matters were docketed with this court the final order of the Commission on SWB's rate request has been issued. As a part of that order, the Commission directed a separate investigation into SWB's "migration strategy" and its effect on SWB's regulated service. However, the Commission found that the "strategy" had not been used in the rate design proposed in

this proceeding. It would therefore appear that a further evidentiary hearing and consideration by the Commission as to the treatment to be accorded the documents here in question would be of no material consequence and remand for that purpose is unnecessary. We conclude that the Commission's order of December 23, 1980, which denied SWB's motion for a protective order was unlawful and unreasonable and that order is vacated. This cause is remanded to the Commission with directions to sustain SWB's motion for a protective order of the documents here in issue to the end that those documents remain under seal and not publicly disclosed by the Commission or its staff, and that such documents be finally disposed of according to normal practices before the Commission.