NOT DESIGNATED FOR PUBLICATION

No. 114,639

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BLUESTEM TELEPHONE COMPANY, *et al.*,
*Appellants*,

v.

KANSAS CORPORATION COMMISSION,
*Appellee,*

MEMORANDUM OPINION

Appeal from Nemaha District Court; JAMES A. PATTON, judge. Opinion filed May 13, 2016. Appeal dismissed.

*Thomas E. Gleason, Jr.*, of Gleason & Doty, Chartered, of Lawrence, *Colleen R. Jamison*, of James M. Caplinger, Chartered, of Topeka, and *Mark E. Caplinger*, of Mark E. Caplinger, P.A. of Topeka, for appellants.

*Brian G. Fedotin*, deputy general counsel and chief appellate counsel, of Kansas Corporation Commission, for appellee.

Before MALONE, C.J., BUSER and BRUNS, JJ.

*Per Curiam*:  To keep telephone rates in rural areas reasonably comparable to rates in more competitive urban markets, the Kansas Corporation Commission (KCC) established the Kansas Universal Service Fund (KUSF), from which funds are distributed to subsidize local telephone companies' actual costs of providing universal service when rural rates are insufficient to cover them. In 2013, the Kansas Legislature passed a bill that created a $30 million cap on KUSF distribution to companies that operate under rate-of-return regulation. After receiving inquiries regarding potential effects of the

1

legislation, the KCC opened a general investigative docket, identifying two proposed implementation strategies and soliciting comments and alternative suggestions. A group of several rural local exchange carriers (the RLECs, now appellants) entered appearances and filed comments suggesting that neither proposed strategy was acceptable. The KCC ultimately issued an order determining that when the cap was reached, the KCC would proportionately reduce the companies' KUSF support based on the amount of support they would have received absent the cap.

The RLECs filed a petition for judicial review. After receiving written and oral arguments from the parties, the district court denied the RLECs' petition, finding that their complaints did not merit setting aside the KCC order. The RLECs timely appealed to this court, arguing (1) the district court erred in finding that the KCC's chosen strategy did not violate the statutory requirement that rate-of-return carriers have the right to recover costs from the KUSF; (2) the district court erred in finding that it was permissible for the KCC to issue its order without first holding an evidentiary hearing; and (3) the district court erred by suggesting that the RLECs seek legislative clarification or amendment of the statute at issue.

After briefing was completed, this court ordered the parties to show cause why the appeal should not be dismissed for lack of justiciability, as it appears the case is not ripe for judicial review. After reviewing the parties' responses and considering their oral arguments, we conclude that this case is not ripe for adjudication for reasons set forth in this opinion. Moreover, we note that this appeal will be rendered moot when a new statute passed by the 2016 Kansas Legislature and signed by the governor becomes effective on July 1, 2016. Thus, we dismiss the RLECs' appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Congress passed the Telecommunications Act of 1996 (the Act) to further deregulate the telecommunications industry. Congress wanted to (1) ensure "universal service" to low-income consumers and those in high-cost areas and (2) promote competition in all markets. See *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 96, 98, 363 P.3d 1115 (2015). The Act required the federal government to create universal service funds to ensure that consumers in high-cost areas were offered rates reasonably comparable to those offered in more competitive markets. 52 Kan. App. 2d at 98. Under the Act, states could adopt their own mechanisms for universal intrastate service as long as those mechanisms were not inconsistent with federal law.

In response to the Act, Kansas passed the Kansas Telecommunications Act (KTA). 52 Kan. App. 2d at 98. The KTA required local telephone companies, also called local exchange carriers, to reduce their rates for intrastate access to a level equal or close to the rates for interstate access, which led to falling long-distance rates but higher local costs. 52 Kan. App. 2d at 99. Rates in more rural areas were required to be reasonably comparable to rates in more competitive urban markets, but sometimes the rural rates were then insufficient to cover the telephone companies' actual costs of providing the universal service the KTA and the Act required. Accordingly, the KCC established the KUSF to subsidize local telephone companies and keep local rates from increasing to an unaffordable level. 52 Kan. App. 2d at 99. When rural rates are insufficient to cover telephone companies' actual prudent costs of providing the universal service the KTA and the Act required, the fund administrator distributes KUSF funds to the companies. 52 Kan. App. 2d at 99.

Kansas statutes required Kansas local telephone companies to file with the KCC, between January 1, 1997, and January 1, 1998, a network infrastructure plan and a regulatory reform plan. See K.S.A. 2015 Supp. 66-2005(a) and (b). In its regulatory

reform plan, each local telephone company "elect[ed] traditional rate of return regulation or price cap regulation." K.S.A. 2015 Supp. 66-2005(b). Under rate-of-return regulation, which is based on cost, telephone companies "can charge rates no higher than necessary to obtain 'sufficient revenue to cover their costs and achieve a fair return on equity.' [Citation omitted.]" See *National Rural Telecom Ass'n v. F.C.C.*, 988 F.2d 174, 177-78 (D.C. Cir. 1993). On the other hand, in price cap regulation, "the regulator sets a maximum price, and the firm selects rates at or below the cap." 988 F.2d at 178. Subject to certain conditions, both rate-of-return companies and price cap companies may receive monetary support from the KUSF. See K.S.A. 2015 Supp. 66-2008(c)(1), (e)(1).

K.S.A. 2015 Supp. 66-2008(e)(1) addresses the calculation of a company's eligibility for KUSF support, stating:  "For each local exchange carrier electing . . . to operate under traditional rate of return regulation, all KUSF support, including any adjustment thereto pursuant to this section shall be based on such carrier's embedded costs, revenue requirements, investments and expenses." According to the KCC's arguments before the district court, KUSF support is calculated annually for the following year and funds are allocated to qualifying carriers in monthly installments. See K.S.A. 2015 Supp. 66-2009(b). Although statutorily the monthly installments are meant to be equal amounts, payment amounts may change based upon periodic audits conducted by the KCC or if the carrier applies for and is granted additional funds. See K.S.A. 2015 Supp. 66-2009(b).

In 2013, the Kansas Legislature passed House Bill 2201, which, among other things, amended the rules for KUSF distributions. See L. 2013 ch. 110, § 11. One of the items in HB 2201, now codified at K.S.A 2015 Supp. 66-2008(e)(3), establishes a $30 million cap on KUSF distributions to rate-of-return companies. The statute states:

> "Notwithstanding any other provision of law, the total KUSF distributions made
> to all local exchange carriers operating under traditional rate of return regulation pursuant

4

to subsection (b) of K.S.A. 66-2005, and amendments thereto, shall not exceed an annual $30,000,000 cap. A waiver of the cap shall be granted based on a demonstration by a carrier that such carrier would experience significant hardship due to force majeure or natural disaster as determined by the commission." K.S.A. 2015 Supp. 66-2008(e)(3).

In addition, K.S.A. 2015 Supp. 66-2008(e)(1), along with mandating that any "adjustment thereto pursuant to this section shall be based on such carrier's embedded costs, revenue requirements, investments and expenses," further stated: "Until at least March 1, 2017, any modification of such support shall be made only as a direct result of changes in those factors enumerated in this subsection."

After the legislation passed, KCC staff (Staff) received many inquiries from rate-of-return companies regarding implementation and potential effects of the bill. Staff prepared a report and recommendation and on June 13, 2013, prior to the legislation taking effect, the KCC opened a docket and solicited comments on issues related to HB 2201, including how to implement the cap on the rate-of-return carrier support. As the KCC acknowledged in its order opening the docket, Staff suggested two options for implementation: (1) not disbursing any additional funding to rate-of-return companies once the cap is reached, or (2) reducing any support beyond the cap proportionately based on the amount each company would have received absent the cap.

The KCC explained the second option with the following example: Imagine that the cap is set at $29 million and there are three companies eligible for funds in the state.

"Company A is deemed eligible to receive $10 million, Company B is deemed eligible to receive $15 million, and Company C is deemed eligible to receive $5 million. Since the total amount of support to be received . . . is $30 million, which exceeds the $29 million cap, the amount of support is reduced by a factor. In this case, the factor would be .96667. Thus, Company A would receive $9.67 million, Company B would receive $14.5 million, and Company C would receive $4.83 million."

5

Comments on the issues identified in the docket were due on June 17, 2013. Between June 13 and June 19, 2013, several RLECs, who are the appellants in this appeal, entered their appearances. The RLECs are: Bluestem Telephone Company; Blue Valley Telecommunications, Inc.; Columbus Communications Services, LLC; Craw-Kan Telephone Cooperative, Inc.; Cunningham Telephone Co., Inc.; The Golden Belt Telephone Cooperative, Inc.; Haviland Telephone Company, Inc.; H & B Communications, Inc.; Home Telephone Co., Inc.; J.B.N. Telephone Company, Inc.; KanOkla Telephone Association; LaHarpe Telephone Co., Inc.; Madison Telephone, LLC; MoKan Dial, Inc.; Moundridge Telephone Co., Inc.; Mutual Telephone Company; Peoples Telecommunications, LLC; The Pioneer Telephone Association, Inc.; Rainbow Telecommunications Association, Inc.; Rural Telephone Service Company, Inc.; S&A Telephone Company, Inc.; The S&T Telephone Cooperative Association, Inc.; South Central Telephone Association; Southern Kansas Telephone Company; Sunflower Telephone Company, Inc.; Totah Communications, Inc.; The Tri-County Telephone Association, Inc.; Twin Valley Telephone, Inc.; United Telephone Association, Inc.; Wamego Telecommunications Co., Inc.; Wheat State Telephone, Inc.; Wilson Telephone Co., Inc.; and Zenda Telephone Co., Inc.

The KCC ultimately extended the comment deadline to July 19, 2013, and the RLECs and other parties filed comments. The RLECs argued that the first option—a moratorium on support after the cap is reached—would violate the statutory guarantee that rate-of-return companies have a reasonable opportunity for recovery of costs. Therefore, they asserted, the KCC could only implement this option if there was a separate, effective, and reasonably available source from which rate-of-return companies could recover those costs. In response to the proposal of proportionate reductions, the RLECs argued that following this FCC implementation strategy of its cap on federal funding was not feasible either, as the reason for the FCC cap was different than the rationale behind the Kansas cap. In addition, they contended that a proportional reduction would violate statutory and constitutional guarantees.

6

After reviewing the comments, Staff filed a second report and recommendation, recommending that the KCC request replies to the comments already filed. The KCC followed this recommendation and, on August 20, 2013, requested additional briefing by September 16, 2013, on issues including how to implement the cap on rate-of-return carrier support. The RLECs were the only party to specifically reply to comments made about the cap on rate-of-return carrier support. Staff subsequently prepared a third report and recommendation, this one considering the reply comments. After noting that only the RLECs and one other party had expressed an opinion on implementation of the cap, Staff recommended that the KCC prorate the support if and when the cap is reached.

In an order mailed December 3, 2013, the KCC addressed the issues that were covered in the docket. Relevant to the issues in this appeal, the KCC determined that the cap did not violate the RLECs' Fifth Amendment rights because the RLECs had "at least three effective and reasonably available sources of revenue" outside of the KUSF funds. Second, the KCC determined that when the cap was reached, the KCC would "reduc[e] carriers' support proportionately based on the amount of support they would have received absent the cap." KCC staff would track monthly rate-of-return carrier support and the cumulative amount of support disbursed throughout the year and, when granting a new request for KUSF support, the KCC and its staff would

> "adjust the reduction factor accordingly to ensure the cumulative KUSF support received does not exceed the $30 million cap for the KUSF fiscal year. Under this approach, the [KCC] may set a new reduction factor at the beginning of each KUSF fiscal year, and adjust it throughout the year to reflect changes to [rate-of-return] carrier support made during the KUSF fiscal year."

The KCC summarized its plan to implement the cap in this way: "Once the $30 million cap on rate-of-return carrier KUSF support is met, KUSF will be distributed on a pro-rata basis."

On December 18, 2013, the RLECs filed a petition for reconsideration of the order. They challenged the KCC's asserted alternative sources of revenue from which rate-of-return carriers could recover costs if and when the KUSF cap is reached. The RLECs also complained that the KCC had failed to develop an evidentiary record to support its findings and had failed to hold an evidentiary hearing in which the RLECs could participate. Although they recognized that the cap had not yet been reached, the RLECs argued that the KCC's order had an immediate adverse effect on them "by jeopardizing the predictability and sufficiency of future support." For these reasons, the RLECs asked the KCC to reconsider its order.

On January 16, 2014, the KCC denied the RLECs' petition for reconsideration. The KCC stated that the RLECs had "ignor[ed] the invitation to offer comments on how to implement the statutory cap," and had instead opposed implementation altogether. Characterizing the RLECs' request for reconsideration as challenging the KCC's implicit conclusion that a prorated approach would satisfy the statutory guarantee that rate-of-return carriers could recover costs through the KUSF, the KCC determined that the request for reconsideration was fatally flawed because it challenged an "implicit conclusion, rather than a specific finding in an Order."

On February 14, 2014, the RLECs filed a petition for judicial review in Nemaha County District Court. In their petition, the RLECs argued that they were adversely affected by the KCC's order because the order restricted access to KUSF funds. The RLECs claimed that access to those funds were necessary to satisfy the statutory guarantee that rate-of-return companies could recover certain costs and to ensure RLECs' continued survival. According to the RLECs, the KCC order also violated the mandate in K.S.A. 66-2008(e)(1) that until March 1, 2017, KUSF support could be modified only "as a direct result of changes in" embedded costs, revenue requirements, investments, and expenses. Therefore, because it anticipated adjusting support as a result of the $30 million cap, the KCC's order improperly denied them their statutory right to an

8

opportunity to recover costs and investments from the KUSF. The RLECs asked the district court to reverse the KCC's order and issue a permanent injunction against application of the order. The KCC filed a response to the petition for judicial review, defending its order.

In their initial brief, filed on December 19, 2014, the RLECs argued: (1) the KCC's conclusion that there are effective sources of revenue other than the KUSF was based on arbitrary and capricious determinations of fact unsupported by substantial evidence; and (2) the KCC's failure to hold an evidentiary hearing prior to making such findings was arbitrary, capricious, unreasonable, and a violation of the RLECs' right to due process. In addition, the RLECs renewed its argument that reducing KUSF distribution without finding a change in embedded costs, revenue requirement, investment, or expenses violated the statutory mandate in K.S.A. 66-2008(e).

The KCC filed its brief on February 27, 2015, contending that the proportional strategy it had adopted was a proper way to implement the statutory cap. To the extent that the cap conflicts with other statutes, the KCC argued that the newer, more specific statute establishing the cap should control. Moreover, the KCC argued that issuing an order without an evidentiary hearing was within its rights and did not violate due process. The KCC also characterized its order as containing only findings of law, so an evidentiary hearing was unnecessary. The RLECs filed a reply brief.

The district court held a hearing on April 10, 2015, at which the parties presented oral argument. The RLECs argued that they were statutorily entitled to recover all of their embedded costs, revenue requirements, investments, and expenses, so to limit that recovery with a $30 million cap was improper. Similarly, the KCC reiterated the arguments in its brief.

9

The district court filed its memorandum decision on September 4, 2015. After establishing the relevant and controlling law and the underlying facts of the case, the district court found that the KCC order did not violate the statutory language requiring that adjustments to KUSF support only be made when based upon the enumerated factors. Specifically, the district court stated:

"If the level of KUSF support is reduced proportionately to all RLEC's, the pro-rate reduction is still based on statutory factors comply [*sic*] with statutes and *Bluestem.*
" . . . The ruling to pro-rate does not deny the RLEC's the right to determine their support based upon the four factors required by statute."

The district court also found that the KCC "was interpreting and enacting the legislation. No fact finding was required." Therefore, according to the district court, no evidentiary hearing was required. The district court denied the petition for review. The RLECs timely appealed the district court's order.

IS THIS CASE RIPE FOR ADJUDICATION?

The first issue is whether this case is ripe for adjudication. As explained in more detail below, the parties argued ripeness before the district court, but the district court did not ultimately rule on the issue. Neither the KCC nor the RLECs briefed ripeness on appeal to this court, but because ripeness implicates jurisdiction and the court can raise jurisdiction on its own motion, this court ordered the parties to show cause why the case should not be dismissed because it is not ripe for adjudication.

Article 3, § 1 of the Kansas Constitution grants "judicial power" exclusively to the courts, which our Supreme Court has consistently recognized as "the 'power to hear, consider and determine controversies between rival litigants.' [Citations omitted.]" See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 895-96, 179 P.3d 366 (2008). This Kansas case-or-controversy requirement requires, in part, that "issues must be ripe, having taken fixed and

10

final shape rather than remaining nebulous and contingent." 285 Kan. at 896. If an issue is not ripe, it is nonjusticiable under Article 3, § 1 of the Kansas Constitution. An opinion issued on a nonjusticiable claim is an advisory opinion and a "Kansas court issuing an advisory opinion would violate the separation of powers doctrine by exceeding its constitutional authority." See 285 Kan. at 898.

Many courts have explicitly linked ripeness and jurisdiction. See, *e.g., Ray Charles Foundation v. Robinson*, 795 F.3d 1109, 1116 (9th Cir. 2015) ("Although neither party argued ripeness, 'it is our duty to consider *sua sponte* whether [a suit] is ripe, because "the question of ripeness goes to our subject matter jurisdiction to hear the case."' [Citations omitted.]"); *Cellport Systems, Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) ("'[T]his court is compelled to assure itself that it has subject matter jurisdiction,' and ripeness is a 'jurisdictional prerequisite.' [Citation omitted.]"); *Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006) ("We review all questions of subject matter jurisdiction, including the justiciability issues of standing, ripeness, and mootness, *de novo*."); *Tavani v. Riley*, 160 Conn. App. 669, 676, 124 A.3d 1009 (2015) ("[J]usticiability comprises several related doctrines, namely standing, ripeness, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction."); *Berger Family Real Estate, LLC v. City of Covington*, 464 S.W.3d 160, 166 (Ky. App. 2015) ("'Because an unripe claim is not justiciable, the circuit court has no subject matter jurisdiction over it.' [Citations omitted.]"). Because ripeness implicates jurisdiction, this court may raise the issue at any time, even on its own motion. See *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 666, 359 P.3d 33 (2015) ("An appellate court can make a *sua sponte* inquiry into whether it has jurisdiction over a question presented to it on appeal. [Citation omitted.]").

"To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract. [Citation omitted.]" *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 170, 210 P.3d 105 (2009). Put another way, "[a] case is ripe for adjudication when the disagreement has taken a final shape and the court can see the

11

legal issues it is deciding, including the impact of the decision upon the adversaries." *In re Tax Exemption Application of Allen, Gibbs & Houlik, L.C.*, 29 Kan. App. 2d 537, 543, 29 P.3d 431 (2001). "'An issue is not ripe for adjudication when there is only the possibility of a future controversy between the parties.' [Citation omitted.]" *Leavenworth Plaza Assocs., L.P. v. L.A.G. Enterprises*, 28 Kan. App. 2d 269, 271, 16 P.3d 314 (2000).

In a motion to dismiss in the district court, the KCC argued that the appeal was not ripe for adjudication, pointing out that the $30 million cap had not yet been reached and might not be reached at all, so the KCC's strategy to prorate KUSF funds if the cap is reached had not yet been implemented. Therefore, the KCC asserted, the implementation was not ripe for adjudication and the district court should dismiss the appeal. The RLECs responded that the KCC's order was final and deprived them of their right to seek recovery of expenses from the KUSF fund. They characterized the KCC order as "illegal" and contended that it caused them immediate harm by affecting "the RLECs['] ability to obtain investment" and their "decisions whether to incur costs." According to the RLECs, prorating the KUSF fund would result in them not being compensated for their costs, potentially reducing investors' rate of return on investments in an RLEC and "chill[ing] the inclination of any entity considering an investment in or making a loan to a Kansas RLEC." In addition, the RLECs expressed concern that if the district court dismissed the appeal as not ripe, the KCC would challenge any later RLEC challenge to the prorating strategy after an actual denial or reduction of KUSF support for failure to pursue timely judicial review of the order adopting the prorating strategy. In its reply to the response, the KCC reiterated its position that the case was not ripe, stating: "Only when and if the cap is reached would the matter be ripe for adjudication."

When the district court ruled on the motion to dismiss, it acknowledged the KCC's contention that the matter was not ripe, but the district court did not address the merits of the argument. Instead, the district court treated the motion as one to dismiss for failure to state a claim upon which relief can be granted. Presumably this is because the KCC

12

identified "K.S.A. 60-212" as relevant statutory authority in the first sentence of its motion to dismiss and K.S.A. 2015 Supp. 60-212(b)(6) allows the defense of a plaintiff's failure to state a claim upon which relief can be granted. Yet the KCC's motion did not specifically identify subsection (b)(6) of K.S.A. 60-212, nor did it request dismissal for failure to state a claim upon which relief could be granted. Because the KCC did not request that the case be dismissed for failure to state a claim upon which relief can be granted, the district court's analysis of the motion under that standard was improper.

The KCC did not ask the district court to make additional findings and address ripeness. Generally, a litigant has the responsibility of objecting to inadequate findings of fact or conclusions of law by the district court in order to give the district court the opportunity to make further findings and conclusions. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012). In the absence of such an objection, Kansas appellate courts usually presume the district court's ruling is supported by all facts necessary. See *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006). Here, however, the issue is ripeness, which implicates subject matter jurisdiction, which this court can address at any time. Therefore, the KCC's failure to request additional findings and conclusions from the district court does not prevent this court from examining and resolving the ripeness issue.

On March 17, 2016, this court ordered the parties to show cause why the appeal should not be dismissed as not ripe for adjudication. In the order, this court noted the district court's recognition in its memorandum decision that the legislature had until March 1, 2017, "to review, amend and clarify whether the cap means no further payments . . . or a pro-ration." This court further pointed out that the record contains no indication that the cap has been reached or the KCC has applied its implementation strategy.

The RLECs filed their response to the show-cause order on March 22, 2016, and the KCC filed its response on March 31, 2016. The RLECs offer a number of reasons

13

why the KCC's plan to implement the cap is ripe for appeal. First, they propose the following test for ripeness in the context of agency decisions:

> "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' [Citations omitted.] Relevant considerations include whether the challenged action is 'definitive' and has a 'direct and immediate effect' on the complaining party; whether the issues tendered are legal; and whether 'administrative decision making has reached a stage where judicial review will not disrupt the orderly process of adjudication.' [Citations omitted.]" *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 6 Kan. App. 2d 444, 453-54, 629 P.2d 1174, *rev. denied* 230 Kan. 819 (1981).

The RLECs argue that this appeal satisfies all of those conditions. As this court has previously recognized, however, *Southwestern Bell*'s discussion of ripeness and finality predated the enactment of the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, so although it is persuasive authority on the reviewability of an *interlocutory* order, it is not persuasive on whether an order is reviewable as a final agency action. See *Williams Gas Pipelines Central, Inc. v. Kansas Corporation Comm'n*, 27 Kan. App. 2d 573, 579, 7 P.3d 311, *rev. denied* 270 Kan. 904 (2000); *Steinmetz v. United Parcel Service*, No. 113,262, 2015 WL 5458767, *3 (Kan. App. 2015) (unpublished opinion).

The RLECs also proffer a number of hypothetical situations in which the KCC's prorata strategy could injure them, pointing out that "any rural company *could* submit an application for additional KUSF support . . . or the KCC *could* initiate an audit" and "the additional demand on the KUSF *could* exceed the sum remaining available under the $30,000,000 cap." (Emphasis added.) The RLECs point out that "[t]hat deprivation *would be* a loss of revenue uncontrollable by the other companies." (Emphasis added.) These contentions clearly demonstrate the ripeness problem in this appeal; as our Supreme Court has previously stated:  "To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract. [Citation omitted.]" *Shipe*, 289 Kan. at 170. Simply

14

put, assertions of hypothetical injury that could occur in the future do not make an issue ripe for judicial consideration.

Next, the RLECs assert that the cap order "has a direct and immediate adverse impact on each RLEC" because it removes the statutory reasonable assurance of recovery of certain costs and expenses. The RLECs claim that the lack of assurance that they can recover those costs affects their "ability to plan and make public utility investments, by abrogating all predictability of recovery and in its place subjecting these public utilities to an undefined and uncertain regulatory methodology subject to change at the whim of the state." However, as this court has previously pointed out, there is no prior caselaw that "mandates that KUSF be paid to *fully* fund an RLEC's embedded costs." See *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 96, 122, 363 P.3d 1115 (2015) (*Bluestem II*).

The RLECs also point out that they are already parties to the instant case, whereas with a future order that actually reduces an RLEC's KUSF support, each RLEC wishing to challenge that order would need to gain standing in that proceeding. The RLECs opine that the KCC would object to any such future challenge as an untimely collateral attack on the order issued in the instant general docket, precluding future judicial review of the prorating strategy. Finally, the RLECs state their belief that "[t]he statutory cap already may be implicated." They identify three cases that may involve the KUSF cap.

First, they point to *Twin Valley Telephone, Inc. v. Kansas Corporation Comm'n*, No. 115,284, a case which is currently pending before this court. The appellant in *Twin Valley* challenges, in part, the KCC's allocation of KUSF funding, claiming that the KCC allowed less KUSF support than it should have allowed. The RLECs assert that if the *Twin Valley* appellant is successful in obtaining a reversal of the KCC's order, the additional KUSF funds it would receive "would exhaust and exceed the balance of KUSF

15

support available" under the $30 million cap, leading to the imposition of the KCC's prorating strategy challenged here.

The RLECs also point to *Moundridge Telephone Company, Inc. v. Kansas Corporation Comm'n*, No. 114,064, 2015 WL 7693784 (Kan. App. 2015) (unpublished opinion), *petition for rev. filed* December 28, 2015, arguing that if our Supreme Court grants review of *Moundridge*, "the imminent application of the statutory cap will be further affected." Like *Twin Valley*, *Moundridge* dealt with a KCC reduction of a telephone company's KUSF support. 2015 WL 7693784, at *1. Although the RLECs here do not articulate in detail how *Moundridge* would affect their position, presumably it is for the same reason they assert *Twin Valley* is relevant: if the telephone company obtains reversal of the reduction in KUSF support, it could push the KUSF funds allocated to the $30 million cap, at which point the KCC would implement their prorated strategy for allocating KUSF funds.

Finally, the RLECs cite *Bluestem II* as another case which they assert "impacts the imminent applicability of the statutory cap." They state that this court's disapproval in *Bluestem II* of the KCC's denial of recovery from KUSF to offset lost intrastate access revenues will further decrease the KUSF funds left available before the $30 million cap is reached. What the RLECs fail to mention about *Bluestem II*, however, is that this court explicitly addressed the ripeness of arguments that "the statutory cap may require [RLECs] to pay an 'arbitrary percentage' of an RLEC's embedded costs." See 52 Kan. App. 2d at 122. This court stated:

> "This argument appears to us as an anticipated battle against a potential unknown foe. While the Commission argues that such actions might arise due to the new statutory cap on the size of KUSF, none of the parties cite to any regulation or actual action by the Commission to impose an across-the-board percentage in determining an individual RLEC's KUSF entitlement.

16

"It is difficult for us to evaluate the abstract interpretation of a statute in a vacuum. As recognized by our Supreme Court, 'issues must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent.' [Citation omitted.] 'The doctrine of ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."' [Citations omitted.] To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract. [Citation omitted.]"' . . .This is especially true since the legislature has mandated that until at least March 1, 2017, any modification of KUSF support shall be made only as a direct result of changes in those factors enumerated in this subsection. K.S.A. 2014 Supp. 66-2008(e)(1)." 52 Kan. App. 2d at 123.

Considering that the *Bluestem II* court recognized that a challenge to a strategy to ensure a cap on KUSF funds was not ripe for adjudication when the KCC had not yet acted to impose a strategy, *Bluestem II* does not support the RLECs' position that the instant case is ripe for appeal. As to the other two cases the RLECs cite, it is unclear why allocation of funds in other cases which could cause the KUSF funding to reach the $30 million cap would render a challenge to the KCC's intended strategy to enforce the cap ripe for adjudication in *this* appeal. Certainly if the telephone companies in *Twin Valley* and *Moundridge* received reduced KUSF funds due to the KCC's prorating strategy, those companies could challenge the prorating strategy at that point.

For its part, the KCC argues again that this case is not ripe for adjudication because the $30 million cap has not yet been reached, nor is there any guarantee that the cap will ever be reached. The KCC is correct. None of the RLECs in this appeal has shown that they have suffered any reduction in KUSF distributions because of the KCC implementing a prorated reduction strategy. Simply put, this issue has not yet taken shape—it is still hypothetical—and therefore it is not ripe for adjudication.

In addition, the KCC argues that this appeal may be moot because of pending legislation. As the KCC points out in its response to this court's show-cause order, the

17

legislature has passed legislation clarifying the cap on KUSF funds and an implementation strategy. On March 29, 2016, House Bill 2131 was enrolled and presented to the governor. See Kansas Legislature Website, http://www.kslegislature.org/li/b2015_16/measures/hb2131/. Section 6 of HB 2131 will amend K.S.A. 2015 Supp. 66-2008(e)(1) to state:

> "For each local exchange carrier electing pursuant to K.S.A. 66-2005(b), and amendments thereto, to operate under traditional rate of return regulation, all KUSF support, including any adjustment thereto pursuant to this section, shall *ensure the reasonable opportunity for recovery of* such carrier's *intrastate* embedded costs, revenue requirements, investments and expenses, *subject to the annual cap established pursuant to subsection (e)(3).*" (Emphasis indicates added language.)

In addition, the legislature added the following language to subsection (e)(3): "In any year that the total KUSF support for such carriers would exceed the annual cap, each carrier's KUSF support shall be proportionately based on the amount of support each such carrier would have received absent the cap." See HB 2131, available at http://www.kslegislature.org/li/b2015_16/measures/documents/hb2131_enrolled.pdf. These amendments make clear the legislature's intent in how the cap shall affect KUSF support—and is the same as the KCC's proposed implementation—and the legislature's intent to guarantee only reasonable recovery subject to the cap rather than full recovery from the KUSF based on the enumerated factors in K.S.A. 66-2008(e)(1).

In a letter of additional authority pursuant to Supreme Court Rule 6.09(b)(1) (2015 Kan. Ct. R. Annot. 53), the KCC notified this court that the governor signed HB 2131 on April 6, 2016. The statutory changes are effective July 1, 2016.

The KCC asserts that the passage of HB 2131 renders this appeal moot. At oral argument, the RLECs pointed out that the statutory amendments do not take effect until July 1, 2016. Thus, the RLECs argue that the statutory amendments do not render this

appeal moot. Moreover, at the oral argument, the RLECs asserted that HB 2131 is unconstitutional. However, the constitutionality of HB 2131 is not properly before this court, although this is an issue that may be raised by the RLECs in future litigation.

The KCC's conclusion that HB 2131 renders this appeal moot is technically premature. The statutory amendments do not become effective until July 1, 2016. Pending legislation does not make an issue moot, despite the fact that, if it becomes law, it may resolve similar questions in future proceedings. However, the passage of HB 2131 by the 2016 Kansas Legislature supports the KCC's argument that the RLECs' claims in this case were never ripe for adjudication in the first place.

In summary, we conclude that this case is not ripe for adjudication. The record on appeal shows no indication that the statutory cap has ever been reached, nor is there any guarantee that the cap will ever be reached. As a result, none of the RLECs in this appeal have shown that they have suffered any reduction in KUSF distributions because of the KCC order implementing a prorated reduction strategy. The RLECs' claims that they have been damaged by the KCC order are hypothetical and have not yet taken shape. As the district court recognized in its memorandum decision, the legislature had until March 1, 2017, "to review, amend and clarify whether the cap means no further payments . . . or a pro-ration." As it turns out, that is exactly what has happened. The 2016 Kansas Legislature passed HB 2131 to make clear that in any year that the total KUSF support exceeds the annual cap, each carrier's KUSF support shall be proportionately based on the amount of support each carrier would have received absent the cap. Thus, it appears that the new legislation, rather than the KCC order, will have controlling effect in all later proceedings. Because an unripe claim is not justiciable, we conclude that the courts lack subject matter jurisdiction over the claims brought by the RLECs in this proceeding.

Appeal dismissed.